UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

THE WESTCHESTER COUNTY
INDEPENDENCE PARTY, IRMA Y. DRACE,
DHYALMA N. VAZQUEZ, SAM ZHERKA, and
DR. GIULIO CAVALLO,

                Plaintiffs,

    -v-

ROBERT P. ASTORINO, ROBERT A.
ASTORINO, DOUGLAS A. COLETY, KEVIN J.
PLUNKETT, DANIEL L. PAGANO, GUY PARISI,
WESTCHESTER COUNTY BOARD OF
ELECTIONS, WESTCHESTER COUNTY
REPUBLICAN PARTY, MORGAN D.
ABDELNOUR, ROBERT G. ALBERTY,
ELISABETH ALBERTY, CHRISTOPHER R.
ARNOLD, NICOLINA BOMMARITO,
FRANCESCA K. BOSSEY, DANIEL BRANDA,
LISA BURKE, NATASHA C. CAPUTO,
CHRISTOPHER S. CAPUTO, THOMAS P.
CASPER, JAMES F. CASTRO-BLANCO, JOHN
A. CERINO, THEODORA CERINO, SUNNY K.
CHACKO, JAMES R. COLEMAN, DIANA
COSTELLO, JOHNNA CULLIGAN, JOSEPH
DALLI, NICHOLAS S. DECICCO, MARICELLY
VELEZ-DELGADO, PETER DELUCIA,
CHARLES P. DUFFY, JESSICA R. EGAN,
ANTHONY F. FERRIELLO, BRIAN P.
FURLONG, MARTIN FINNERAN, GERARD R.
GERSHONOWITZ, DEBORAH GERACE,
PHILLIPPE M. GILLE, LINDSAY ANN
JACKSON, JOSEPH D. KENNER, PATRICIA E.
LEAVY, GERARD LONGARZO, JR., MARY
JENNINGS MAHON, SHEILA MARCOTTE,
JAMES MAISANO, JOHN B. MCCAFFREY,
MATTHEW J. MCCARRICK, DIANA
MCCAUGHEY, PHILOMENA M. MCCLOSKEY,
FELICIA MCCLOSKEY, EDWIN J.
MCCORMACK, EVELYN M. MCCORMACK,
ROSEMARY A. MCGLAUGHLIN, ROBERT F.
MEEHAN, EILEEN MARY MILDENBERGER,

Case No. 13-CV-7737 (KMK)

AMENDED
OPINION & ORDER

AMANDA MODUGNO, MICHAEL ANTHONY
MONTELEONE, WILLIAM M. MOONEY, III,
HENRY C. NEUBECK, DEBORAH S. OGDEN,
GEORGE OROS, CHRISTINA A. OROS, IRIS
THERESA PAGAN, ANTHONY PILLA,
KATHRYN C. PLUNKETT, DAVID P. POLIZZI,
MICHAEL RECCA, THOMAS M. REDDY,
VICTORIA ROACH, ADAM RODRIGUEZ,
ELENA FORTUNA ROGLIANO, DONALD B.
SCOTT, STEPHANIE T. SCOTT, CHRISTINE A.
SCULTI, MARGARET M. SCULTI, BERNICE
SPRECKMAN, ARTHUR R. SULLIVAN, JR.,
JOHN G. TESTA, BRITTA VANDER LINDEN,
YU FLORA WU-BIAGI, LUCAS A. VANDER
LINDEN, ALBERTO F. VILLATE, HOLLY C.
YOUNG, EDWARD A. ZEBZDA, NANCY
MEEHAN, FRANK CATALINA, HUGH FOX, JR.,
KATHERINE DELGADO, MOSES PABON,
EDWARD FAGAN, JAVIER VINCENS, and
BRENDAN MURNANE,

                    Defendants.

Appearances:

Peter Howard Tilem, Esq.
Tilem and Campbell, LLP
White Plains, NY
*Counsel for Plaintiffs*

William Patrick Harrington, Esq.
Richard Francis Markert, Esq.
Susan Elizabeth Galvao, Esq.
Bleakley Platt & Schmidt, LLP
White Plains, NY
*Counsel for Defendants Robert A. Astorino, Robert P. Astorino, Kevin J. Plunkett, Morgan D.
Abdelnour, Robert G. Alberty, Francesca K. Bossey, Daniel Branda, Natasha C. Caputo,
Thomas P. Casper, James F. Castro-Blanco, John A. Cerino, Sunny K. Chacko, James R.
Coleman, Diana Costello, Joseph Dalli, Maricelly Velez-Delgado, Peter DeLucia, Charles P.
Duffy, Jessica R. Egan, Anthony F. Ferriello, Brian P. Furlong, Martin Finneran, Gerard R.
Gershonowitz, Phillippe M. Gille, Lindsay Ann Jackson, Joseph D. Kenner, Patricia E. Leavy,
Gerard Longarzo, Jr., Sheila Marcotte, James Maisano, John B. McCaffrey, Matthew J.
McCarrick, Edwin J. McCormack, Rosemary A. McGlaughlin, Eileen Mary Mildenberger,
Amanda Modugno, William M. Mooney, III, Deborah S. Ogden, George Oros, Iris Theresa
Pagan, Daniel L. Pagano, Michael Recca, Elena Fortuna Rogliano, Stephanie T. Scott, Christine*

*A. Sculti, Donald B. Scott, Bernice Spreckman, Arthur R. Sullivan, Jr., John G. Testa, Britta Vander Linden, Lucas A. Vander Linden, Yu Flora Wu-Biagi, Katherine Delgado, Edward Fagan, and Brendan Murnane*

Ronald George Crispi, Esq.
Peter Riggs, Esq.
Cerussi & Spring
White Plains, NY
*Counsel for Defendants Robert A. Astorino, Guy Parisi, Elisabeth Alberty, Christopher S. Caputo, Theodora Cerino, Diana McCaughey, Philomena M. McCloskey, Felicia McCloskey, Evelyn M. McCormack, Henry C. Neubeck, Christina A. Oros, Kathryn C. Plunkett, Thomas M. Reddy, Victoria Roach, Margaret M. Sculti, Frank Catalina, Moses Pabon, Hugh Fox, Jr., and Javier Vincens*

Fred N. Knopf, Esq.
John Martin Flannery, Esq.
Allison Michelle Holubis, Esq.
Peter Alexander Meisels, Esq.
Wilson Elser Moskowitz Edelman & Dicker LLP
White Plains, NY and Stamford, CT
*Counsel for Defendants Douglas A. Colety and Westchester County Board of Elections*

James John Mahon, Esq.
Lawler Mahon & Rooney LLP
New York, NY
*Counsel for Defendants Daniel L. Pagano, Thomas P. Casper, Joseph Dalli, Charles P. Duffy, Mary Jennings Mahon, Rosemary A. McGlaughlin, and Lucas A. Vander Linden*

John Martin Murtagh, Jr., Esq.
Gaines, Novick, Ponzini, Cossu & Venditti, LLP
White Plains, NY
*Counsel for Defendant Westchester County Republican Party*

Howard M. Miller, Esq.
Jessica Christine Moller, Esq.
John F. McKay, III, Esq.
Richard S. Finkel, Esq.
Bond, Schoeneck & King, PLLC
Garden City, NY
*Counsel for Defendants Christopher R. Arnold, Nicolina Bommarito, Lisa Burke, Johnna Culligan, Nicholas S. DeCicco, Deborah Gerace, Michael Anthony Monteleone, Anthony Pilla, David P. Polizzi, Adam Rodriguez, Alberto F. Villate, Holly C. Young, Edward A. Zebzda, and Nancy Meehan*

Brian S. Sokoloff, Esq.
Mark Anthony Radi, Esq.
Sokoloff Stern LLP
Carle Place, NY
*Counsel for Robert F. Meehan*
Justin Richard Adin, Esq.
Westchester County Attorney's Office
White Plains, NY
*Counsel for Defendant Hugh Fox, Jr.*

KENNETH M. KARAS, District Judge:

Irma Y. Drace ("Drace"), Dhyalma N. Vazquez ("Vazquez"), Sam Zherka ("Zherka"), and Dr. Giulio Cavallo ("Cavallo") (collectively, the "Individual Plaintiffs"), and The Westchester County Independence Party (the "Independence Party" or the "Party") (together, with the Individual Plaintiffs, "Plaintiffs") bring suit against 90 Defendants, under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 et seq. Plaintiffs allege that Defendants violated and conspired to violate 18 U.S.C § 1962(b) and § 1962(c). Plaintiffs also allege that Defendants individually violated and conspired to violate the constitutional protections of the Due Process Clause, the First Amendment, and the Equal Protection Clause, and that Defendants Westchester County Board of Elections ("Board of Elections") and Douglas A. Colety ("Colety") committed the state tort of breach of fiduciary duty. Defendants move to dismiss all claims against them. For the following reasons, Defendants' Motions To Dismiss are granted.[1]

---

[1] Defendants Joseph Dalli and Morgan D. Abdelnour were omitted from the caption of this Opinion and Order because the docket indicated that both of these Defendants were terminated from the case on August 13, 2014. (*See* Dkt. No. 196.) However, it appears that Clerk's Office made an error in terminating these Defendants because the Stipulation and Order dismissing certain Defendants without prejudice on that date did not apply to either Joseph Dalli or Morgan D. Abdelnour. (*See* Stipulation and Order Dismissing Second Am. Compl. Without Prejudice as to Certain Defs. (Dkt. No. 196).)

I.  Background

A.  Factual Background

The following factual summary is derived from Plaintiffs' Second Amended Complaint ("SAC"), which is assumed to be true for the purposes of these Motions.

1.  The Parties

The Independence Party is a political third party located in the County of Westchester. (SAC ¶ 1.)  Plaintiff Drace was an employee in the Westchester County Attorney's Office Law Department and is the Treasurer of the Westchester County Independence Party.  (*Id.* ¶ 2.) Plaintiff Vazquez is the Vice-Chair of the Independence Party, an Executive Committee member of the New York State Independence Party, a County Committee member, a District Leader and a Judicial Delegate.  (*Id.* ¶ 3.)  Zherka is a member of the Independence Party, and a District Leader.  (*Id.* ¶ 4.)[2]  Cavallo is the Chairman of the Independence Party and the New York State Executive Committee Vice Chairman, as well as a Westchester County Judicial Delegate, County Committee Member, and District Leader.  (*Id.* ¶ 5.)

A full description of the more than 90 Defendants is unnecessary, with the exception of Robert P. Astorino ("Astorino").[3]  Astorino was elected Westchester County Executive in 2009. (*See, e.g.*, *id.* ¶ 100.)  Plaintiffs allege that all other Defendants were connected to Astorino in some way, for example, that they were employed by him, friends with him, related to him, or related to, friends with, or employed by people connected to him.  (*See id.* ¶¶ 7–95.)

_____

[2] At oral argument, the Court was advised that Zherka will be dropping out as a Plaintiff; however, he has not taken any action to do so.  (*See* June 9, 2015 Oral Argument Tr. 7.)

[3] The Court notes that there are two Defendants, Robert P. Astorino and his father, Robert A. Astorino.  (*See* SAC ¶ 6.)  All references to Astorino in this Opinion are to Robert P. Astorino.

2.  The Alleged Scheme

As alleged by Plaintiffs, this case concerns a scheme to raid the Independence Party in anticipation of the September 2013 primary election in order to ensure that Astorino, a Republican, would win the Independence Party nomination for County Executive, whereby more than 4,000 people who were not truly in sympathy with the principles of the Independence Party enrolled in the Party "at the midnight hour" in order to vote in the primary.  (*See id.* at 9–10; ¶¶ 71, 603–04.)  Under New York election law, individuals must register in a party well in advance of a primary election; thus, the deadline for registering in the Independence Party for the primary election held on September 10, 2013 was October 12, 2012 at 5 p.m.  (*Id.* ¶¶ 71, 120.)[4]

Plaintiffs allege that in 2010, Astorino "began an elaborate scheme to infiltrate and raid the Independence Party in a bid to rig the outcome of the September 10, 2013, countywide Independence Party primary elections."  (*Id.* ¶ 225.)  As evidence of this, Plaintiffs point to a phone call between Astorino and Zherka that occurred in March 2013, wherein Astorino allegedly stated that "he and his cohorts essentially raided the Independence Party to 'buy insurance' in an attempt to rig and manipulate the outcome of the Independence Primary Election and to 'decapitate' duly elected, Independence Party Chairman Giulio Cavallo and Vice Chairperson Dhyalma Vazquez, rendering them politically irrelevant so that no one [would] ever need their support or endorsement."  (*See id.* ¶¶ 226, 231.)  In this phone call, Astorino allegedly stated that "he knew immediately after getting elected in 2009 that he would not be re-endorsed

---

[4] Under state law, the deadline for switching party affiliations to be able to vote in a primary election is 25 days before the preceding general election.  N.Y. Elec. Law § 5-304(3).  In 2012, the general election was held on November 6, 2012, and thus the cutoff to switch parties for the 2013 primary was 25 days before November 6, 2012—October 12, 2012.

by the Westchester County Independence Party chairman Dr. Giulio Cavallo," and therefore decided on the course of action to raid the party.  (*Id.* ¶ 226.)

According to Plaintiffs, Defendants "used phones, email, fax, mail, and other forms of electronic communications, in order to scheme and defraud others, by falsely representing that these individuals were in sympathy with the principles of the Independence Party or in related efforts to raid the Independence Party," (SAC ¶¶ 46–47, 51, 54, 56–58, 60, 61, 63, 65–66, 72–73, 75–77, 79–91, 93, 95, 271, 374, 384, 394, 397, 410, 414, 417–21, 425–27, 430, 432–33, 438–39, 447–49, 452, 454–56, 458–60, 462, 502–03, 518, 520), and that they actively participated in registering friends, family, and acquaintances into the Independence Party in efforts to raid the Independence Party, (*id.* ¶¶ 6–7, 14, 16–17, 22, 24–51, 53–55, 57–58, 60–61, 63, 65–67, 69–70, 72–93, 95, 99, 223, 271, 310, 341, 344, 374, 384–85, 387, 394, 397, 414, 416–20, 424–26, 430, 432–34, 438–40, 442, 447–49, 452, 455–60, 462, 465, 468–70, 477, 502–03, 510, 512, 515, 517–18, 520, 529, 534).[5]  As noted, one purpose of the scheme was rigging the outcome of the Independence Party's Primary Election.  (*See id.* ¶ 100 (alleging that Robert P. Astorino "organized an illicit, fraudulent scheme to rig the outcome of the September 10, 2013, county-wide Independence party primary election by inducing and coercing individuals to switch their party affiliations and enlist in the Independence Party"); *id.* ¶ 103 (alleging that "numerous Defendants enrolled in the Independence Party . . . for the sole purpose of assisting the Candidate for County Executive, Co-Conspirator Defendant Robert P. Astorino in his plan to 'raid' and take over the Independence Party and rig the outcome of its Primary Election" (emphasis omitted)); *id.* ¶ 108 ("Each and every defendant, with intent to deceive, participated in an illicit,

_____

[5] These identical allegations are made, on information and belief, against dozens of Defendants with no other factual allegations.

organized[,] and fraudulent scheme to rig the outcome of the September 10, 2013, county-wide Independence Party primary election by inducing and coercing individuals to switch their party affiliations and enlist in the Independence Party."); *id.* ¶ 227 ("This course of action included an illicit and fraudulent scheme designed to induce and/or coerce his family members, County employees directly under his control, close associates, and others easily linked to him into an organized campaign to register new voters and change party affiliation of other voters to the Westchester County Independence Party for the *sole purpose* of rigging and manipulating the outcome of the Party's primary election." (emphasis added)); *id.* ¶ 241 (describing the scheme's purpose as to "rig the primary election process"); *id.* ¶ 282 (describing the "fraudulent scheme to rig the primary election and secure the nomination of the Westchester Independence Party Line"); *id.* ¶ 402 ("Upon information and belief, all the raiders of the Independence Party had a single aim in mind: to manipulate and rig the outcome of the primary election in favor of the co-conspirators."); *id.* ¶ 569 ("Each Defendant worked together continuously, methodically to achieve the Scheme—to raid and injure the Independence Party by taking it over and making it their Party."); *id.* ¶ 570 ("As to the mail and wire fraud being related: both were engaged in for the same purpose to take active steps to raiding the Independence Party by registering in the Independence Party and making phone calls, sending emails and the like to spread instructions on when, where[,] and how to join the party.").  There are also some, but comparatively very few, allegations that certain Defendants' goals were to rig the primary and/or the general election, and future elections.  (*See, e.g.*, *id.* ¶ 314 (alleging that Defendant Alberty intended to manipulate the September 10, 2013 primary and future elections); *id.* ¶ 330 (same with respect to Defendant Arnold); *id.* ¶¶ 351, 409 (same with respect to Defendant Christopher Caputo); *id.* ¶ 408 (same with respect to Defendant Natasha Caputo).)  The only other references to use of the

mail or wires in the SAC is with reference to the mailings of registration applications in September and October 2012 with allegedly fraudulent information.  (*See* SAC ¶¶ 179–81, 183.)

Plaintiffs also allege that Defendants violated numerous state election laws in carrying out this scheme.  For example, Plaintiffs allege that many of the Defendants were notaries and made false statements, (*id.* ¶ 547), that Defendants registered people despite knowing that they were ineligible to vote, (*id.* ¶ 541), that certain Defendants had registration cards that were backdated and submitted after the deadline to register individuals to vote, (*see id.* ¶ 475), and that certain Defendants allowed petitions to be filed after the deadlines had passed, (*see id.* ¶ 495). The latest that Plaintiffs allege a registration application was postmarked but still accepted was October 19, 2012.  (*See id.* ¶ 183.)

### 3.  Related Lawsuits

On July 31, 2013, an action, *Rhoades v. The Westchester County Board of Elections*, No. 3001/13 (Sup. Ct. Aug. 12, 2013) ("*Rhoades I*"),[6] was brought in New York State Court by Richard Rhoades ("Rhoades") by order to show cause, "seeking to declare invalid the Opportunity to Ballot petition for a write-in candidate for the Public Office of Westchester County in the Independence Party Primary Election to be held on September 10, 2013."  (*Id.* ¶ 116.)  On August 12, 2013, the Supreme Court cancelled the enrollment of several of the respondents in that action, which resulted in the Opportunity to Ballot petition for a write-in candidate being invalidated.  (*Id.* ¶¶ 154–55.)

---

[6] The relevant order in this case is reproduced at Plaintiff's Exhibit H1.

A second law suit, *Rhoades v. The Westchester County Board of Elections*, No. 3268/2013 (Sup. Ct.) ("*Rhoades II*"),[7] was commenced on August 10, 2013, when Rhoades sent a letter to Cavallo, challenging the enrollment of party enrollees. (*Id.* ¶ 159.) Cavallo appointed a subcommittee to investigate, (*id.* ¶ 160), conducted hearings, determined that the individuals were not in sympathy with the Party, and sought to cancel their enrollment, (*id.* ¶ 162). This cancellation was refused by the New York Supreme Court in February 2014, (*id.* ¶ 165; *see also* SAC Ex. H3 (Westchester County Supreme Court Decision) 49, 53), which decision was then overturned by the Appellate Division, which granted the request to "disenroll nearly 4000 voters from the Independence Party" in March 2014, (*id.* ¶¶ 166–69).

### 4. Plaintiff's Claims

#### a. Injuries to Plaintiffs

The SAC alleges the following injuries: (1) that the Independence Party "has been unable to earn the money donations it normally secures to elect candidates of their [sic] choice; (2) "the Independence Party's business of choosing and securing candidates of their [sic] choice that are in sympathy with the principles of the Independence Party has been injured," (3) "[i]ndividual Independence voters were injured when their vote did not count as a result of this Scheme," (4) "jobs were lost on a county level as . . . at least three County Legislators who normally would not have secured the Independence vote, did so and were elected," and (5) Plaintiffs' right to association was impaired. (*Id.* ¶¶ 581–85.) The SAC also repeatedly alleges "the Independence Party of Westchester County has been damaged by this raid in its ability to raise funds, maintain

---

[7] The Supreme Court's order in this case is reproduced at Plaintiff's Exhibit H2–H3. The Appellate Division's decision has been published. *See Rhoades v. Westchester Cty. Bd. of Elections*, 985 N.Y.S.2d 576 (App. Div. 2014).

its integrity and reputation in Westchester County, and be an integral part of the election process in properly nominating candidates for public office."  (*See, e.g.*, ¶ 114 (emphasis omitted).)

The SAC also alleges that Drace and Vazquez lost their jobs, and that Cavallo was not reappointed to a volunteer position on the Westchester County Police Advisory Board.  Plaintiffs allege that Drace was fired because of "her role in the sub-committee hearing held to dis-enroll thousands of newly added voters to the Independence Party," under the pretextual excuse that she was fired because she failed a civil service exam.  (SAC ¶ 305–08.)  With respect to Vazquez, Plaintiffs allege that Vazquez opposed a plan by Astorino and Gille to demote minority Department of Social Services workers.  (*Id.* ¶ 293.)  Additionally, the SAC alleges that "by late December 2012, Vazquez made it clear that the Independence Party would not re-endorse [Astorino] for re-election to the County Executive's Office."  (*Id.* ¶ 296.)  In retaliation, Astorino transferred Vazquez to a "non-existent position," and she was terminated thereafter.  (*See id.* ¶¶ 297, 302.)  With respect to Cavallo, the SAC alleges that in retaliation for Cavallo not endorsing Astorino for the 2013 County Executive Office position, Astorino blocked Cavallo's reappointment to the Westchester County Police Advisory Board, a non-compensated position.  (*Id.* ¶¶ 276–78.)  The SAC does not allege any specific injury to Zherka, who, in any event, will be dropping out from the case.

### b.  Benefits to Defendants

Plaintiffs also allege that many Defendants benefited by virtue of their participation in the scheme.  For example, Plaintiffs allege that, as a result of their participation in the scheme to raid the Independence Party, numerous Defendants were given raises or peculiarly high salaries, (*see, e.g.*, *id.* ¶¶ 358, 361, 454, 513–18), that some Defendants or their family members were rewarded by being offered employment with the County, (*see, e.g.*, *id.* ¶¶ 523, 525–26, 529), and that some

Defendants were given unusually large sums of money from Astorino's political fund, (*see, e.g., id.* ¶¶ 532–38).

### B.  Procedural Background

Plaintiffs filed a Complaint on October 31, 2013.  (*See* Dkt. No. 1.)  On January 15, 2014, Plaintiffs filed an Amended Complaint, adding and dropping some Defendants.  (*See* Dkt. No. 3.)  On March 13, 2014, the Court held a pre-motion conference, where the Parties discussed Defendants' letters seeking leave to file motions to dismiss.  (*See* Dkt. (minute entry for Mar. 13, 2014).)  On April 2, 2014, the Court held a second pre-motion conference and granted Plaintiffs leave to further amend their Complaint.  (*See* Dkt. (minute entry for Apr. 2, 2014).)  On May 7, 2014, the Court denied Plaintiffs' request to begin "nonparty discovery."  (*See* Dkt. No. 174.)  Plaintiffs filed the SAC on June 24, 2014.  (*See* Dkt. No. 182.)  The SAC dropped approximately 30 Defendants, and on August 13, 2014, the Court so ordered a stipulation of dismissal of those Parties.  (*See* Dkt. No. 196.)[8]

Pursuant to a scheduling order entered by the Court on July 18, 2014, (*see* Dkt. No. 184), Defendants filed their Motions To Dismiss no later than September 12, 2014.  (*See* Dkt. Nos. 207–09, 220–22, 227, 229–30, 232–34, 236–38, 240–41, 244–46, 250–52.)  On November 10, 2014, Plaintiffs filed a consolidated opposition to all of the Motions To Dismiss.  (*See* Dkt. No. 264.)  On November 21, 2014 Elisabeth Alberty, Robert A. Astorino, Christopher S. Caputo, Frank Catalina, Theodora Cerino, Diana McCaughey, Felicia McCloskey, Philomena

---

[8] Specifically, the following Defendants were dismissed: Douglas F. Abdelnour, Ralph J. Berardi, Jr., Mary L. Capoccia, Katharine Wilson Conroy, Carmen Dalli, Robert Delgado, James C. Freeman, David B. Gelfarb, Leigh A. Giroux, Stephanie H. Giroux, Judith Hradsky, Charles A. King, Joseph Charles Marchese III, Gregory G. McBride, Jeanine P. McCarrick, Janice P. Modugno, Anthony Modugno, Kimberly HP Morella, Karen Ann Murphy, Andrea C. Rendo, Adelaide Rogliano, Antonio Rogliano, Yuzeth M. Smith, Glen P. Solimine, Anthony J. Tripodi, Yolanda Valencia, John Vemi, Jean M. Maisano, Nanny Testa, and John Rivers.  (Dkt. No. 196.)

McCloskey, Evelyn McCormack, Henry Neubeck, Christina Oros, Moses Pabon, Kathryn C. Plunkett, Thomas M. Reddy, Victoria Roach, Margaret M. Sculti, and Javier Vincens filed a letter correcting a point of law in their Memorandum of Law.  (Dkt. No. 265.)  Defendants then filed Reply papers between December 10, 2014 and December 12, 2014.[9]  (*See* Dkt. Nos. 277, 279, 280–82, 286.)  In September 2014, numerous Defendants requested permission to file motions for sanctions pursuant to Rule 11.  (*See* Dkt Nos. 257–59.)  The Court determined that it would defer any Rule 11 litigation until the Motions To Dismiss were resolved.  (*See* Dkt. No. 261.)  The Court heard oral argument on all Motions To Dismiss on June 9, 2015.  (*See* Dkt. (minute entry for June 9, 2015).)

## II.  Discussion

### A.  Standard of Review

Defendants move to dismiss Plaintiffs' SAC under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (brackets, citations, and internal quotation marks omitted).  Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement."  *Id.* (internal quotation marks and brackets omitted).  Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the

---

[9] Defendant Westchester County Republican Party did not file a Reply brief.

speculative level . . . ." *Twombly*, 550 U.S. at 555.  Although "once a claim has been stated

adequately, it may be supported by showing any set of facts consistent with the allegations in the

complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that

is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claim[] across the

line from conceivable to plausible, the[] complaint must be dismissed," *id; see also Iqbal*, 556

U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a

context-specific task that requires the reviewing court to draw on its judicial experience and

common sense.  But where the well-pleaded facts do not permit the court to infer more than the

mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the

pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R.

Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hyper-

technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a

plaintiff armed with nothing more than conclusions.").[10]

　　　"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the

factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *see

also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) ("In addressing the sufficiency of a

complaint we accept as true all factual allegations . . . ." (internal quotation marks omitted));

*Dixon v. United States*, No. 13-CV-2193, 2014 WL 23427, at *1 (S.D.N.Y. Jan. 2, 2014) ("For

the purpose of this motion to dismiss, we assume that the facts alleged in [the plaintiff's]

complaint are true.").  Further, "[f]or the purpose of resolving [a] motion to dismiss, the

---

[10] Plaintiffs' reliance on pre-*Twombly* and *Iqbal* pleading standards is obviously misplaced.  (*See* Pls.' Mem. 7 ("A complaint may only be dismissed when 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957)).)

Court . . . draw[s] all reasonable inferences in favor of the plaintiff." *Daniel v. T&M Prot. Res., Inc.*, No. 13-CV-4384, 2014 WL 182341, at *1 n.1 (S.D.N.Y. Jan. 16, 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.

"In ruling on a 12(b)(6) motion, . . . a court may consider the complaint as well as any instrument attached to the complaint as an exhibit or any statements or documents incorporated in it by reference," as well as "matters of which judicial notice may be taken, and documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Kalvanaram v. Am. Ass'n of Univ. Professors at N.Y. Inst. of Tech., Inc.*, 742 F.3d 42, 44 n.1 (2d Cir. 2014) (brackets and internal quotation marks omitted)); *see also Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) ("In adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." (internal quotation marks omitted)); *Hendrix v. City of New York*, No. 12-CV-5011, 2013 WL 6835168, at *2 (E.D.N.Y. Dec. 20, 2013) (same).

B.  Analysis

1.  RICO Claims

Plaintiffs claim that Defendants violated RICO (18 U.S.C. § 1962(c) and § 1962(b)), and conspired to violate RICO (18 U.S.C. § 1962(d)).  Defendants move to dismiss these claims.

a.  RICO Claim Under § 1962(c)

In their First Cause of Action, Plaintiffs allege that Defendants violated 18 U.S.C.

§ 1962(c).[11]  While the Supreme Court has noted that RICO is to "be liberally construed to

effectuate its remedial purposes," *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 498 (1985)

(internal quotation marks omitted), courts have cautioned that, because "the 'mere assertion of a

RICO claim has an almost inevitable stigmatizing effect on those named as defendants, courts

should strive to flush out frivolous RICO allegations at an early stage of the litigation,'" *Katzman*

*v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 655 (S.D.N.Y. 1996) (alterations omitted)

(quoting *Figueroa Ruiz v. Alegria*, 896 F.2d 645, 650 (1st Cir. 1990)), *aff'd sub nom. Katzman v.*

*Victoria's Secret Catalogue, Div. of The Ltd., Inc.*, 113 F.3d 1229 (2d Cir. 1997); *see also*

*Aronov v. Mersini*, No. 14-CV-7998, 2015 WL 1780164, at *3 (S.D.N.Y. Apr. 20, 2015) (same);

*Turner v. N.Y. Rosbruch/Harnik, Inc*., — F. Supp. 3d —, 2015 WL 500493, at *4 (E.D.N.Y. Feb.

4, 2015) (same); *Ferro v. Metro. Ctr. for Mental Health*, No. 13-CV-2347, 2014 WL 1265919, at

*2 (S.D.N.Y. Mar. 27, 2014) (same), *reconsideration denied*, 2014 WL 2039132 (S.D.N.Y. May

16, 2014).

"A private cause of action under RICO requires that the plaintiff allege: '(1) the

defendant's violation of 18 U.S.C. § 1962, (2) an injury to the plaintiff's business or property,

and (3) causation of the injury by the defendant's violation.'"  *Fertitta v. Knoedler Gallery, LLC*,

No. 14-CV-2259, 2015 WL 374968, at *5 (S.D.N.Y. Jan. 29, 2015) (quoting *Lerner v. Fleet*

*Bank, N.A.,* 459 F.3d 273, 283 (2d Cir. 2006)).  Turning to the first requirement, to establish a

---

[11] This provision provides that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."  18 U.S.C. § 1962(c).

defendant's violation of 18 U.S.C. § 1962, a plaintiff must allege "the existence of seven constituent elements: (1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." *Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 17 (2d Cir. 1983); *see also Aronov*, 2015 WL 1780164, at *3 (same). With regard to the racketeering activity requirement, the statute provides a list of criminal acts that can constitute predicate acts of racketeering. *See* 18 U.S.C. § 1961(a) (defining "racketeering activity"). Notably, mail fraud under 18 U.S.C. § 1341 and wire fraud under 18 U.S.C. § 1343 are predicate acts of racketeering activity, but crimes related to state election fraud are not. *See id.*

Defendants argue that Plaintiffs have not adequately pled most of these requirements. The Court agrees.

### i.  Plaintiffs Fail to Allege Any RICO Predicates

In response to Defendants' claim that Plaintiffs' allegations are insufficient, Plaintiffs argue only that they have adequately pleaded RICO predicates of mail and wire fraud. (*See* Mem. of Law in Opp'n to Defs.' Mot. To Dismiss ("Pls.' Mem.") 17–19 (Dkt. No. 264).) "The elements of wire fraud under 18 U.S.C. § 1343 are (i) a scheme to defraud (ii) to get money or property, (iii) furthered by the use of interstate wires." *Tymoshenko v. Firtash*, 57 F. Supp. 3d 311, 321 (S.D.N.Y. 2014) (internal quotation marks omitted) (quoting *United States v. Pierce*, 224 F.3d 158, 165 (2d Cir. 2000)); *see also Azkour v. Haouzi*, No. 11-CV-5780, 2012 WL 3667439, at *4 (S.D.N.Y. Aug. 27, 2012) (same). "The elements of mail fraud under 18 U.S.C. § 1341 are identical, except that mail fraud must be furthered by use of the mails." *Tymoshenko*, 57 F. Supp. 3d at 321; *see also S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp.*, 84 F.3d 629,

633 (2d Cir. 1996) ("A complaint alleging mail and wire fraud must show (1) the existence of a scheme to defraud, (2) defendant's knowing or intentional participation in the scheme, and (3) the use of interstate mails or transmission facilities in furtherance of the scheme."); *Mayfield v. Asta Funding, Inc.*, — F. Supp. 3d —, 2015 WL 1501100, at *7 (S.D.N.Y. Mar. 31, 2015) (same); *Delgado v. Ocwen Loan Servicing, LLC*, No. 13-CV-4427, 2014 WL 4773991, at *17 (E.D.N.Y. Sept. 24, 2014) (same).

For both wire and mail fraud, the object of the scheme to defraud must be *money or property*. *See Pierce*, 224 F.3d at 165 ("In the context of mail fraud and wire fraud, the words 'to defraud' commonly refer to wronging one in his property rights by dishonest methods or schemes, and usually signify the deprivation of something of value by trick, deceit, chicane or overreaching. A scheme to deceive, however dishonest the methods employed, is not a scheme to defraud in the absence of a property right for the scheme to interfere with." (citations and some internal quotation marks omitted)); *Tymoshenko*, 57 F. Supp. 3d at 321 ("[T]o violate either the wire fraud or mail fraud statute, 'the object of the fraud' must 'be [money or] property in the victim's hands.'" (quoting *Pasquantino v. United States,* 544 U.S. 349, 355 & n. 2 (2005) (alteration in original))); *United States v. Martin*, 411 F. Supp. 2d 370, 373 (S.D.N.Y. 2006) ("The wire fraud statute . . . requires that money or property be the object of the defendant's 'scheme to defraud.'"); *cf. United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987) (holding that the government, to substantiate a mail fraud or wire fraud charge, must "prove that [the] defendants contemplated some actual harm or injury to their victims" (emphasis omitted)).

To understand what schemes are covered by these statutes, it is helpful to briefly consider the history of their interpretation by the Supreme Court.[12]  First, in *McNally v. United States*, 483 U.S. 350 (1987), *superseded in part by statute as stated in Skilling v. United States*, 561 U.S. 358 (2010), the Supreme Court considered the conviction of a state actor and a private individual for mail fraud for their "participation in a self-dealing patronage scheme [that] defrauded the citizens and government of Kentucky of certain 'intangible rights,' such as the right to have the Commonwealth's affairs conducted honestly."  *Id.* at 352.  The Supreme Court overturned the mail fraud convictions, reasoning that the "mail fraud statute clearly protects property rights, but does not refer to the intangible right of the citizenry to good government."  *Id.* at 356.  Later that year, the Supreme Court clarified that the mail fraud statute still covered intangible *property* rights.  *See Carpenter*, 484 U.S. at 25 (affirming a conviction for mail fraud for a scheme with an object of confidential business information, reasoning that its "intangible nature does not make it any less 'property' protected by the mail and wire fraud statutes").  Congress responded to *McNally* by enacting 18 U.S.C. § 1346, the Honest Services Fraud Statute, which is a "definitional statute, providing that, '[f]or the purposes of this chapter'—a chapter that includes the Wire Fraud [and Mail Fraud] Statute[s]—'the term "scheme or artifice to defraud" includes a

---

[12] The Court notes that the mail fraud and wire fraud statutes are interpreted uniformly, such that cases about one statute are equally applicable to the other.  *See Pasquantino*, 544 U.S. at 380 n.2 (noting, in discussing a case that interpreted the term "property" in the mail fraud statute, that the Supreme Court has "construed identical language in the wire and mail fraud statutes *in pari material*"); *Carpenter v. United States*, 484 U.S. 19, 25 n.6 (1987) (noting, in analyzing whether "money or property" was the object of a scheme, that "[t]he mail and wire fraud statutes share the same language in relevant part, and accordingly [the Supreme Court] appl[ies] the same analysis to both sets of offenses here"); *United States v. Reifler*, 446 F.3d 65, 95 (2d Cir. 2006) ("In interpreting § 1343, we look not only to cases decided under that section but also to cases involving 18 U.S.C. § 1341, the mail fraud statute, as § 1341 uses the same relevant language in prohibiting the furtherance of fraudulent schemes by use of the mails."); *United States v. Slevin*, 106 F.3d 1086, 1088 (2d Cir. 1996) ("Because these statutes use the same relevant language, they are analyzed in the same way.").

19

scheme or artifice to deprive another of the intangible right of honest services.'" *United States v. Smith*, 985 F. Supp. 2d 547, 590 (S.D.N.Y. 2014) (first alteration in original) (quoting 18 U.S.C. § 1346); *see also Skilling*, 561 U.S. at 402 (explaining that Congress passed § 1346 in response to the *McNally* decision "specifically to cover one of the intangible rights that lower courts had protected prior to *McNally*" (alteration and internal quotation marks omitted)); *United States v. Rybicki*, 287 F.3d 257, 261 (2d Cir. 2002) (same), *on reh'g in banc*, 354 F.3d 124 (2d Cir. 2003); *United States v. Silver*, — F. Supp. 3d —, 2015 WL 4496295, at *5 (S.D.N.Y. July 24, 2015) (same).

Over a decade after § 1346 was enacted, in *Cleveland v. United States*, 531 U.S. 12 (2000), the Supreme Court considered a mail fraud conviction based on false statements in an application for a state license. *Id.* at 15. In reversing the conviction, the Supreme Court reasoned that the Honest Services Fraud Statute was not implicated, holding that "[it] does not suffice . . . that the object of the fraud may become property in the recipient's hands," but rather that, "for purposes of the mail fraud statute, *the thing obtained must be property in the hands of the victim*," and that the licenses were not property in the hands of the state. *Id.* (emphasis added). Another decade later, in *Skilling v. United States*, the Supreme Court limited the scope of the Honest Services Fraud Statute, holding that it only covered quid pro quo arrangements, namely kickbacks or bribes, in violation of a fiduciary duty. *See* 561 U.S. at 407, 411; *Smith*, 985 F. Supp. 2d at 590.[13] Together, these cases establish that the object of mail or wire fraud

---

[13] "Under New York law, a fiduciary relationship exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *Smith*, 985 F. Supp. 2d 599–600 (alterations and internal quotation mark omitted). "Such a relationship is necessarily fact-specific, and is grounded in a higher level of trust than normally present between those involved in arm's length business transactions. At the heart of the fiduciary relationship lies reliance, and de facto control and dominance." *Id.* at 600 (alterations, citation, and internal quotation mark omitted).

must be the deprivation of money or tangible or intangible property in the hands of the victim, and for honest services to be such property, there must be a bribe or kickback and a violation of a fiduciary duty.

With that backdrop, the Court now turns to Plaintiffs' claims in this case.  Plaintiffs allege that Defendants "used phones, email, fax, mail, and other forms of electronic communications, in order to scheme and defraud others, by falsely representing that these individuals were in sympathy with the principles of the Independence Party or in related efforts to raid the Independence Party," (SAC ¶¶ 46–47, 51, 54, 56–58, 60, 61, 63, 65–66, 72–73, 75–77, 79–91, 93, 95, 271, 374, 384, 394, 397, 410, 414, 417–21, 425–27, 430, 432–33, 438–39, 447–49, 452, 454–56, 458–60, 462, 502–03, 518, 520), and that they actively participated in registering friends, family, and acquaintances into the Independence Party in efforts to raid the Independence Party, (*id.* ¶¶ 6–7, 14, 16–17, 22, 24–51, 53–55, 57–58, 60–61, 63, 65–67, 69–70, 72–93, 95, 99, 223, 271, 310, 341, 344, 374, 384–85, 387, 394, 397, 414, 416–20, 424–26, 430, 432–34, 438–40, 442, 447–49, 452, 455–60, 462, 465, 468–70, 477, 502–03, 510, 512, 515, 517–18, 520, 529, 534).[14]  Plaintiffs describe one purpose of the scheme as rigging the outcome of the Independence Party's 2013 Primary Election.  (*See id.* ¶¶ 100, 103, 108, 187, 225, 227, 241, 282, 402, 425, 569, 570.)  There are also some, but comparatively very few, general allegations that certain Defendants' goals were to rig the primary and/or the general election, and future elections.  (*See, e.g.*, *id.* ¶¶ 314, 330, 351, 408, 409.)

The scheme to raid the Independence Party, or to rig the outcome of the primary or general election, cannot serve as the foundation of a RICO predicate because the object of the

---

[14] As noted, these identical allegations are made, on information and belief, against dozens of Defendants with no other factual allegations.

scheme was neither the deprivation of honest services nor of money or property.  With respect to

the honest services, Plaintiffs allege that some Defendants were rewarded for participation in the

alleged scheme, for example by receiving raises, but Plaintiffs fail to allege that any Defendant

was acting in violation of a fiduciary duty.  Indeed, Plaintiffs do not make any effort to include

allegations that explain how or why Astorino, a Republican, had a fiduciary duty to the

Independence Party.  Nor are there an allegations that Defendants sought to have Independence

Party members breach their fiduciary duty to their party.  Therefore, under *Skilling*, Plaintiffs fail

to allege the deprivation of honest services.  *See Perryman v. Litton Loan Servicing, LP*, No. 14-

CV-2261, 2014 WL 4954674, at *15 (N.D. Cal. Oct. 1, 2014) (holding that the plaintiffs failed to

sufficiently allege honest services fraud under *Skilling* because they had not alleged the existence

of a fiduciary relationship and therefore that such fraud could not serve as RICO predicates in a

civil RICO case).

Next, the object of the scheme, as alleged, was control over the Independence Party,

which cannot be considered property in the hands of the victim.  In *McNally*, the Supreme Court

cited *United States v. Clapps*, 732 F.2d 1148 (3d Cir. 1984), and *United States v. States*, 488

F.2d 761 (8th Cir. 1973), as examples of courts previously reading the wire fraud and mail fraud

statutes to include "schemes to defraud . . . designed to deprive individuals, the people, or the

government of intangible rights, such as the right to have public officials perform their duties

honestly," which reading the Court rejected in *McNally*.  *See McNally*, 483 U.S. at 358–59

(citing *Clapps*, 732 F.2d at 1152; *States*, 488 F.2d at 764).  In *Clapps*, the Third Circuit affirmed

a mail fraud conviction that involved the fraudulent procurement and marking of absentee ballots

in two primary elections and a general election, reasoning that the statute included a "scheme to

deprive an electoral body of its political rights to fair elections free from dilution from the

intentional casting and tabulation of false, fictitious or spurious ballots." 732 F.2d at 1149, 1153. Similarly, in *States*, the Eighth Circuit upheld a mail fraud conviction based on a "scheme to defraud the voters . . . by the use of fraudulent voter registrations and applications for absentee ballots," where the alleged "purpose of the scheme to defraud was to influence the outcome of the election of the Republican Committeeman for the nineteenth ward and the Democratic Committeeman for the third ward for the purpose of securing and controlling said political offices and the political influence and financial benefits of said offices." 488 F.2d at 762 (internal quotation marks omitted). It is worth noting that in both *Clapps* and *States*, the courts upheld these convictions not based on the theory that the victims of the schemes somehow had a property right of which they were deprived, but rather based on the theory that the scheme deprived people of intangible non-property rights, that is, the intangible right to an honest election. *Cf. United States v. Turner*, 465 F.3d 667, 672–73 (6th Cir. 2006) ("A review of the prominent pre-*McNally* election fraud cases . . . reveals that none referred to the harm flowing from election fraud as a deprivation of a right to 'honest services.' Indeed, most of these cases recognized that the application of the statute to election fraud was a modification of the intangible right of honest services, defined as a right to an honest election."). And, although Congress reinvigorated some of the pre-*McNally* case law by enacting the Honest Services Fraud Statute, it is clear in the wake of *Skilling* that deprivations of intangible rights, such as the right to a free and fair election, cannot constitute wire fraud or mail fraud without a quid pro quo bribery scheme and a breach of a fiduciary duty. *See Skilling*, 561 U.S. at 407, 411 (limiting § 1346 to conduct that involved quid pro quo arrangements in violation of a fiduciary duty). That is to say, while the passage of § 1346 covered some of the schemes covered by the mail fraud and wire fraud statutes pre-*McNally*, nothing in § 1346, especially as interpreted by

23

*Skilling*, can be read to bring the type of scheme alleged here back within the purview of the mail and wire fraud statutes.

Indeed, following *McNally*, no court has held that a scheme to rig an election itself constitutes money or property fraud.  *See, e.g.*, *United States v. DeFries*, 129 F.3d 1293, 1304 (D.C. Cir. 1997) (holding that, under *McNally* and *Carpenter*, the right to fair elections is "a[n] . . . 'ethereal' interest that does not constitute 'property' under section 1341," reasoning that "it [was] particularly instructive that, in explaining the types of schemes that could not properly support a conviction under section 1341, the *McNally* Court referred to two election fraud cases as examples"); *United States v. Gordon*, 836 F.2d 1312, 1314 (11th Cir. 1988) (holding that the Supreme Court's references to *Clapps* and *States* in *McNally* "seem[ed] to have repudiated the argument that election fraud cases involve more than an intangible right"); *Ingber v. Enzor*, 841 F.2d 450, 451, 453, 456 (2d Cir. 1988) (vacating the conviction of a defendant who falsified voting documents, including absentee ballots, and who thereby "obtained through fraud the salary, powers[,] and privileges of the Office of Supervisor," because the government's theory of "deprivation of the right to fair and impartial elections" was "impermissible under *McNally*" (internal quotation marks omitted)); *United States v. Schermerhorn*, 713 F. Supp. 88, 89 (S.D.N.Y. 1989) (noting that the Second Circuit has "held that the citizenry's intangible right to free and fair elections falls within the good-government intangible held by the *McNally* Court to be beyond the statute's reach" (citing *Ingber v. Enzor*, 664 F. Supp. 814, 820 (S.D.N.Y. 1987), *aff'd*, 841 F.2d 450 (2d Cir. 1988))).

Proponents of a broad reading of "money or property" have had some—but still, extremely limited—success advocating a theory that election fraud can constitute money or property fraud when *the object* of the scheme is to obtain the salary that comes with elected

24

office, the "salary theory" of election fraud.  *See Schermerhorn*, 713 F. Supp. at 92 (accepting

the salary theory); *United States v. Webb*, 689 F. Supp. 703, 707 (W.D. Ky. 1988) (same).  This

theory has been accepted where the government is acting as an employer and thus has a property

interest in choosing how to spend its money on its employees.  *See United States v. Granberry*,

908 F.2d 278, 280 (8th Cir. 1990) (holding that a school bus driver who received a school bus

operator permit by falsifying an application and concealing that he had been convicted of first-

degree murder committed money or property fraud because the "School District ha[d] been

deprived of money in the very elementary sense that its money [went] to a person who would not

have received it if all of the facts had been known"); *United States v. Doherty*, 867 F.2d 47, 60

(1st Cir. 1989) (holding that a fraudulent scheme to obtain promotions by cheating on exams

counted as money or property fraud because "[g]etting jobs by false pretenses . . . 'deprived' the

Commonwealth 'of control over how its money was spent'" (quoting *McNally*, 483 U.S. at 360)).

However, the salary theory is an imperfect fit in the election context because the

government has no choice in who is to be elected.  It is the electorate that decides who receives

the salary, and the government simply is required to pay the salary to the winner.  Thus, the cases

discussing the property interest the government holds in choosing how to spend its money

"address the government's role as employer, where job qualifications can be economically

quantified, are not analogous to an election fraud case, where the government's role is purely

administrative and the public's role is a political one."  *Turner*, 465 F.3d at 682.  Indeed, most

courts to have considered this issue have concluded that a scheme to obtain a salary that comes

with elected office cannot be the basis for money or property fraud.  *See Ratcliff*, 488 F.3d at 645

("Although the charged scheme involves [the defendant] ultimately receiving money from the

parish, it cannot be said that the parish would be deprived of this money by means of [the

defendant's] misrepresentations, as the financial benefits budgeted for the parish president go to the winning candidate regardless of who that person is.  Nor would the parish be deprived of its control over the money by means of [the defendant's] fraud, as the parish has no such control other than ensuring that the benefits are paid to the duly elected candidate."); *Turner*, 465 F.3d at 680 ("In the context of election fraud, the government and citizens have not been deprived of any money or property because the relevant salary would be paid to someone regardless of the fraud. In such a case, the citizens have simply lost the intangible right to elect the official who will receive the salary."); *United States v. Goodrich*, 871 F.2d 1011, 1013–14 (11th Cir. 1989) ("[T]he property interest alleged to have been denied the victim here—what the government contends Hillsborough County paid salaries for but did not get—is the 'honest and faithful services' of the County Commissioners, an interest *McNally* held to be unprotected by the mail fraud statute.  Thus, this 'property interest' is indistinguishable from the intangible right to good government described in *McNally* and cannot sustain the mail fraud count."); *United States v. George*, No. 86-CR-123, 1987 WL 48848, at *2 (W.D. Ky. Oct. 20, 1987) ("Had the schemes succeeded, the taxpayers and voters of Marion County would not have been deprived of any money or property.  They would have been deprived of the right to determine to whom the money was to be paid.  Without regard to the outcome of the election, the County Judge/Executive by statute was to be paid a salary and reimbursed for expenses.  Simply put, the citizenry lost no money or property but only the intangible right legally to elect their County Judge/Executive.").[15]

---

[15] This view is supported by reasoning in *McNally*.  In that case, the Supreme Court considered "whether a state officer violates the mail fraud statute if he chooses an insurance agent to provide insurance for the State but specifies that the agent must share its commissions with other named insurance agencies, in one of which the officer has an ownership interest and hence profits when his agency receives part of the commissions."  483 U.S. at 360.  In

In the Second Circuit, the precedent on the salary theory is mixed.  In *Ingber v. Enzor*, 664 F. Supp. 814 (S.D.N.Y. 1987), *aff'd*, 841 F.2d 450 (2d Cir. 1988), a court in this district considered whether a mail fraud conviction based on election tampering should be overturned after *McNally*.  The court concluded both that (1) the conviction based on "tampering with the election process, [and thereby] depriving the voters of their right to honest elections," was no longer "within the reach of § 1341" after *McNally*, and that (2) "the scheme to get the salary and perquisites of office was essentially the same thing as the scheme to defraud the public of its right to a fair election," and that the "payment of the Supervisor's salary, a routine and budgeted Town expenditure, to [the defendant] rather than to his opponent . . . does not constitute a loss of money or property as contemplated by *McNally* and the mail fraud statute."  *Id.* at 820–21.  The Second Circuit affirmed.  However, in so doing, the Second Circuit relied on just the first ground, reasoning that because the jury reached a general verdict on the relevant count, it was not possible to determine if the jury reached the verdict on an impermissible ground.  *Ingber*, 841 F.2d at 456.  Based on this decision, at least two lower courts within the Second Circuit have suggested that the Second Circuit had implicitly accepted the salary theory.  *See Schermerhorn*, 713 F. Supp. at 90–91 ("Although not free from doubt, we think that pregnant in the above conclusion is the implicit belief that the alternative charge, based on the fraudulent attainment of a public salary, survived *McNally* and was a legitimate ground for the jury's decision."); *United*

---

overturning the conviction, the Court held that the jury was "not required to find that the Commonwealth itself was defrauded of any money or property," reasoning that "[i]t was not charged that in the absence of the alleged scheme the Commonwealth would have paid a lower premium or secured better insurance," "[n]or was the jury charged that to convict it must [have found] that the Commonwealth was deprived of control over how its money was spent."  *Id.* "Indeed," the Court reasoned, "the premium for insurance would have been paid to some agency."  *Id.*  Although not directly on point, this reasoning supports rejection of the salary theory with respect to election fraud.  *United*

*States v. Myerson*, No. 87-CR-796, 1988 WL 68143, at *2 (S.D.N.Y. June 21, 1988) ("By implication, the Second Circuit considered the deprivation of the position and salary of Supervisor to be a property right protected by the mail fraud statute.").  However, the Second Circuit more recently has noted that it has had "no occasion to determine whether, as the government urges" it had "implicitly accepted" the salary theory.  *United States v. Coppola*, 671 F.3d 220, 237 n.11 (2d Cir. 2012); *see also Stinn v. United States*, 856 F. Supp. 2d 531, 543 n.12 (E.D.N.Y. 2012) (noting that the Second Circuit "has yet to decide this issue" (citing *Coppola*, 671 F.3d at 237 n.11)), *aff'd*, 515 F. App'x 4 (2d Cir. 2013).

Because the Second Circuit has yet to address this issue and because the Court is persuaded by the reasoning of other circuits discussed above, it joins the majority of courts in holding that a person who has committed election fraud in order to obtain the normal salary given to the person holding that elected office has not committed money or property fraud, because the victim—the government—has not been deprived either of any money or property or of the choice in how to spend money.  Rather, it is the public that is deprived of an intangible right to a free election, which cannot support a money or property fraud conviction and, in the absence of a quid pro quo and a violation of a fiduciary duty, cannot support an honest services fraud conviction.

However, even if the Court were to decide otherwise and find that the salary theory was valid with respect to election fraud, Plaintiffs still would not have adequately alleged such a theory in the SAC.  As alleged, the object of the scheme was not to get a salary; rather, it was to rig elections.  This claimed objective is insufficient because it does not suggest that the purpose of the fraud was to obtain salary.  Indeed, the bulk of Plaintiffs' allegations, which merely claim that the object of the fraud was to rig the *primary* election, are even less sufficient because there

28

is no salary to be directly obtained by virtue of winning a primary.[16]  *See Webb*, 689 F. Supp. at

708 (noting, after accepting the validity of the salary theory in an election fraud case, that "[i]t is

now the responsibility of the United States to prove that these defendants *intended to* acquire this

tangible property of the Commonwealth of Kentucky," that is, the salary); *Schermerhorn*, 713 F.

Supp. at 93 ("Whether the Government can actually prove in this case that the object of the

defendant's alleged scheme was to take the salary and monetary benefits that inure with election

as a state senator is a matter that will take some work."); *see also Turner*, 465 F.3d at 680

("Interestingly, the two district courts that accepted the salary theory in an election fraud setting

both explicitly recognized the difficulty of procuring a conviction based on an intent to obtain a

salary."). Thus, even were the Court to accept this dubious theory, Plaintiffs have not alleged that

the object of the scheme was to obtain tangible property—the salaries at issue. *Cf. Tymoshenko*,

57 F. Supp. 3d at 321–22 ("At this stage, the [c]ourt accepts as true [the] [p]laintiffs' claim that

property owners wasted their time and money by treating the defendants' sham proposals as

legitimate.  But that fact alone is insufficient to establish that the property owners' money was

the *object* of the defendants' fraudulent conduct, as required by the wire and mail fraud statutes."

(citation and internal quotation marks omitted)).  Similarly, to the extent that Plaintiffs allege that

---

[16] Only a few sentences out of the 631-paragraph SAC could even potentially suggest that salary was an aim, and each is insufficient. First, the introduction to the SAC says that the "Co-Conspirator Defendants" were "[m]otivated by greed, patronage, and the pecuniary interest in County jobs and power . . . ."  (*See* SAC 10.)  Second, paragraph 576 alleges: "As to the mail fraud—the Defendants developed this Scheme the object of or intent was to disenfranchise and control the outcome of an election thereby securing lucrative jobs and positions of power in Westchester County while also taking control of the Independence Party ridding it of its current leadership and putting persons in the party that will elect and support persons of their political yoke."  (SAC ¶ 576.)  Lastly, paragraph 603 states: "Co-Conspirator Defendants also engaged in a scheme to register over 4,000 persons to the Independence Party in an effort to raid the Independence Party and rig the election by ensuring that the Co-Conspirator Defendants' candidate choices were elected to lucrative jobs and positions of power with the County."  (SAC ¶ 603.)  These conclusory allegations fail to plausibly state a mail or wire fraud claim.

Defendants were rewarded for participation in the scheme, by being given raises or other money or property, this is insufficient for the same reason: Plaintiffs do not allege that obtaining that money or property was each Defendant's reason for participating in the alleged scheme.[17]

### ii.  Plaintiffs Fail to Plead a Pattern of Racketeering

Even assuming that Plaintiffs had sufficiently alleged RICO predicates, the § 1962(c) claim should still be dismissed because Plaintiffs fail to sufficiently allege a pattern of racketeering activity.  RICO itself provides that a "'pattern of racketeering activity' requires at least two acts of racketeering activity, . . . the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity."  18 U.S.C. § 1961(5).  The racketeering acts must be from the crimes listed in § 1961(1) and they must be "related, *and* [either] . . . amount to or pose a threat of continued criminal activity."  *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999) (internal quotation marks omitted).  The continuity requirement can be shown in two ways: a closed-ended pattern or an open-ended pattern.  *See*

---

[17] Because the Court holds that money or property was not the object of the scheme, it need not consider whether the allegations against Defendants would be sufficient if Plaintiffs had alleged money or property as the object of the scheme.  However, the Court notes that it has serious doubts that Plaintiffs have met the pleading requirements of Rule 9(b) that apply when alleging fraud-based claims, to wit, that a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *Lerner*, 459 F.3d at 290.  For example, as to numerous Defendants, Plaintiffs allege merely that they "actively participated in registering friends, family, and acquaintances into the Independence Party in efforts to raid the Independence Party and used phones, email, fax, mail, and other forms of electronic communications, in order to scheme and defraud others, by falsely representing that these individuals were in sympathy with the principles of the Independence Party or in related efforts to raid the Independence Party."  (*See, e.g.*, SAC ¶¶ 47, 51, 58, 60.)  Additionally, Plaintiffs allege only that *four* registrations were sent by mail, and they do not allege what fraudulent statements those registrations contained, or even that they were submitted by non-bona-fide Independence Party members.  (*See id.* ¶¶ 179–81, 183 (alleging that the registration forms of Susan Heimanson, Brent Martin, Richard Graap, and Liza Weiner, who are not mentioned anywhere else in the SAC, were sent by mail).)

*Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008).  A "closed-ended pattern" is "a series of related predicate acts extending over a substantial period of time," while an "open-ended pattern" is a "pattern of racketeering activity that poses a threat of continuing criminal conduct beyond the period during which the predicate acts were performed."  *Id.* Plaintiffs argue that the scheme at issue here qualifies as both a closed-ended and an open-ended pattern of racketeering activity.  (*See* SAC ¶ 571 ("Here the Scheme can be deemed a close ended, continuous criminal Scheme as the Defendants engaged in the predicate acts of mail and wire fraud beginning in or about the year 2010 and the Scheme involves thousands of participants with thousands of victims with one Scheme in mind, that is to take over and raid the Independence Party."); *id.* ¶ 572 ("Further the Scheme herein can also be described as an open ended continuity in that there is a threat that the conduct of raiding a party will recur in the future.  So that the conduct of the Defendants, raiding the Independence Party can actually occur again by persons continuing to join in the Independence Party when their motives are not to join because they are in sympathy with the principles of the Party, but because they are interested in rigging elections.").)  However, the Court concludes that Plaintiffs do not sufficiently allege *either* an open-ended or a closed-ended pattern of racketeering activity.

"To satisfy closed-ended continuity, the plaintiff must prove 'a series of related predicates extending over a substantial period of time.'"  *Cofacredit*, 187 F.3d at 242 (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 242 (1989)).  "[C]losed-ended continuity is primarily a temporal concept."  *Spool*, 520 F.3d at 184 (internal quotation marks omitted); *see also Aronov*, 2015 WL 1780164, at *5 ("The Second Circuit has identified several non-dispositive factors considered by courts in determining whether closed-ended continuity exists, including, *inter alia,* the length of time over which the alleged predicate acts took place, the

31

number and variety of acts, the number of participants, the number of victims, and the presence

of separate schemes.  Notwithstanding this list of factors, the Second Circuit has repeatedly

emphasized that closed-ended continuity is primarily a temporal concept . . . ." (citation and

internal quotation marks omitted)).  Although there is not a bright line for what constitutes a

"substantial period of time," since the Supreme Court set forth that requirement in *H.J.*, the

Second Circuit has "never held a period of less than two years to constitute a substantial period

of time."  *Spool*, 520 F.3d at 184 (internal quotation marks omitted); *see also Lefkowitz v.*

*Reissman*, No. 12-CV-8703, 2014 WL 925410, at *6 (S.D.N.Y. Mar. 7, 2014) (same); *Li Jun An*

*v. Hui Zhang*, No. 13-CV-5064, 2013 WL 6503513, at *8 (S.D.N.Y. Dec. 6, 2013) (same);

*Boritzer v. Calloway*, No. 10-CV-6264, 2013 WL 311013, at *11 (S.D.N.Y. Jan. 24, 2013)

(same); *Kilkenny v. Law Office of Cushner & Garvey, L.L.P.*, No. 08-CV-588, 2012 WL

1638326, at *7 (S.D.N.Y. May 8, 2012) (same); *Purchase Real Estate Grp. Inc. v. Jones*, No. 05-

CV-10859, 2010 WL 3377504, at *9 (S.D.N.Y. Aug. 24, 2010) (same); *cf. City of New York v.*

*LaserShip, Inc.*, 33 F. Supp. 3d 303, 311 (S.D.N.Y. 2014) ("More recently, the Second Circuit

clarified that it has 'not viewed two years as a bright-line requirement,' although 'it will be rare

that conduct persisting for a shorter period of time establishes closed-ended continuity.'"

(quoting *Spool*, 520 F.3d at 184)).  Importantly, the "relevant time period . . . is the time during

which RICO predicate activity occurred, not the time during which the underlying scheme

operated or the underlying dispute took place."  *Spool*, 520 F.3d at 184; *see also H.J.*, 492 U.S. at

242 ("A party alleging a RICO violation may demonstrate continuity over a closed period by

proving a *series of related predicates extending over a substantial period of time*." (emphasis

added)); *Cofacredit*, 187 F.3d at 243 ("[T]he duration of a pattern of racketeering activity is

32

measured by the RICO predicate acts the defendants commit."); *Aronov*, 2015 WL 1780164, at
*5 (same); *Li Jun An*, 2013 WL 6503513, at *8 (same).

Plaintiffs' arguments in opposition to the Motions rely on the statements Astorino
allegedly made while on the phone with Zherka, and summarily allege that "[t]his massive effort
on the part of the Defendant co-conspirators did not occur in a single month or over the course of
one short year but was planned and executed for over four years."  (Pls.' Mem. 25.)  Plaintiffs
apparently derive this time period by assuming that the closed-ended pattern began in 2010, (*see*
SAC ¶ 568), and was completed in 2013 at the time of the primary election, (*see* SAC ¶ 108).  It
is worth noting that the only citation to the SAC in this portion of Plaintiffs' Opposition is to a
discussion of the 2013 Astorino tape.  (*See* Pls.' Mem. 25–26 (citing SAC ¶ 568).)[18]  However,
as noted above, the duration of a pattern of racketeering activity is measured by the RICO
predicates alleged by Plaintiffs, and the only allegations in the SAC that could conceivably be
considered mail fraud took place in September and October 2012—the mailings of registration
forms with allegedly fraudulent information.  (*See* SAC ¶¶ 179–81, 183.)  And although the SAC
contains conclusory assertions that the mail and wire fraud began in 2010, (*see* SAC ¶ 225
(alleging that Astorino "took office in or about January 2010 and upon information and belief,
immediately thereafter, began an elaborate scheme to infiltrate and raid the Independence Party
in a bid to rig the outcome of the September 10, 2013, countywide Independence Party primary
elections."); *id.* ¶ 554 (alleging that "this scheme was hatched in or about the year 2010"); *id.*
¶ 571 ("[T]he Scheme can be deemed a close ended, continuous criminal Scheme as the
Defendants engaged in the predicate acts of mail and wire fraud beginning in or about the year

---

[18] The Court notes the burden placed on Defendants and the Court to wade through
Plaintiffs' disorganized, 174-page SAC was furthered by Plaintiffs' failure to cite to relevant
portions of the SAC in their Opposition.

2010 . . . ."); *id.* ¶ 580 ("We submit the acts of mail and wire fraud began in the later part of the

year 2010 and continued unabated until 2013 without interruption of any kind . . . ."); *id.* ¶ 598

("Said scheme has been ongoing since the year 2010 when calls, emails[,] meetings[,] and other

evidence of the meeting of the minds on this scheme[] began."), such general assertions are

insufficient to support a plausible inference that mail and wire fraud predicates occurred

beginning in 2010. That is, the combination of Rule 9(b) and *Twombly*'s plausibility

requirement means that Plaintiffs cannot merely rely on these conclusory assertions. *See Spool*,

520 F.3d at 184–85 (noting that "the defendants' alleged overcharging of [certain] fees in late

2002 [could not] begin the reference period [for closed-ended continuity under RICO]" because

"[e]ven if [the court] [were to] assume that these activities could constitute mail fraud or wire

fraud if proved . . . , the amended complaint [would] still [be] legally insufficient because the

allegations regarding the . . . fees [were not] pled with the requisite particularity" under Fed. R.

Civ. P. 9(b).); *Kalimantano GmbH v. Motion in Time, Inc.*, 939 F. Supp. 2d 392, 412 (S.D.N.Y.

2013) (noting that "[a]lthough [the plaintiff's] allegations nominally are consistent with a period

of . . . just under three years [or more] . . . , the allegations as to the [first predicate acts] are too

blurry and inexact to qualify as RICO predicates," because "[a]llegations of predicate acts

sounding in fraud, including claims of mail or wire fraud, must be pled with the heightened

pleading requirements of Federal Rule of Civil Procedure 9(b)"); *Grimes v. Fremont Gen. Corp.*,

785 F. Supp. 2d 269, 301 (S.D.N.Y. 2011) ("Although [the] [p]laintiffs assert that the enterprise

operated for over two years, and that the illegal activities persisted from in or before 2005 until

mid–2006, they provide no basis for that belief, or *any* facts regarding when the enterprise began,

or other specific predicate acts of mail and wire fraud." (citations omitted)); *Purchase Real*

*Estate Grp.*, 2010 WL 3377504, at *8 ("While courts have made an exception to the particularity

requirements and have allowed allegations to be based on information and belief when facts are peculiarly within the opposing party's knowledge, this exception must not be mistaken for license to base claims of fraud on speculation and conclusory allegations, especially in the context of RICO claims." (brackets and internal quotation marks omitted)).

At oral argument, Plaintiffs argued for the first time that the voter registration information annexed to the SAC was sufficient to establish a pattern over a sufficiently long time period. In particular, Plaintiffs' counsel argued that the cards annexed to the SAC indicated that some people who registered in 2010 and 2011 were among those voters purged from the ranks of the Independence Party as part of the *Rhoades II* decision. (*See* June 9, 2015 Oral Argument Tr. 77–83; *see also* SAC Exs. B, B2.) However, as acknowledged by counsel at argument, there is *no allegation* in the SAC that these 2010 and 2011 registrations were mailed, or that the registrants were not bona fide Independence Party members, especially given Plaintiffs' counsel's admission that some disenrolled members might have been legitimate Party members. (*See* June 9, 2015 Oral Argument Tr. 69, 81–83.) Thus, Plaintiffs do not plausibly plead that any racketeering activity occurred in 2010 or 2011.

The SAC also fails to sufficiently allege an open-ended pattern. "To satisfy open-ended continuity, the plaintiff need not show that the predicates extended over a substantial period of time but must show that there was a threat of continuing criminal activity beyond the period during which the predicate acts were performed." *Cofacredit*, 187 F.3d at 242. "In assessing whether or not the plaintiff has shown open-ended continuity, the nature of the RICO enterprise and of the predicate acts are relevant." *Id.* For example, "[w]here the enterprise is engaged primarily in racketeering activity, and the predicate acts are inherently unlawful, there is a threat of continued criminal activity, and thus open-ended continuity." *Id.* at 242–43; *see also Spool*,

520 F.3d at 185 (holding that a threat of continuing criminal activity is "generally presumed when the enterprise's business is primarily or inherently unlawful").

Here, the SAC does not allege that the alleged enterprise is primarily engaged in racketeering activity.  Indeed, the primary activities of Defendants are to run a political party and to support Astorino's candidacy.  (*See* SAC 4–10.)  Moreover, the conduct alleged in the SAC does not fall within the "inherently unlawful" category, because "fraud (the object of which is by definition to obtain money or property from others) has been held not to be 'inherently unlawful' in the RICO continuity context."  *Int'l Bhd. of Teamsters v. Carey*, 297 F. Supp. 2d 706, 715 (S.D.N.Y. 2004), *aff'd sub nom. Int'l Bhd. of Teamsters v. Blitz*, 124 F. App'x 41 (2d Cir. 2005); *see also Kalimantano*, 939 F. Supp. 2d at 408 (holding that "fraudulent practices . . . do not imply a threat of continuing criminal activity over time"); *Ho Myung Moolsan Co. v. Manitou Mineral Water, Inc.*, 665 F. Supp. 2d 239, 261 (S.D.N.Y. 2009) ("[F]raud is not inherently unlawful in the RICO context." (internal quotation marks omitted)); *World Wrestling Entm't, Inc. v. Jakks Pac., Inc.*, 530 F. Supp. 2d 486, 516 (S.D.N.Y. 2007) ("While embezzlement, extortion, bribery, and money laundering are in pursuit of inherently unlawful goals, fraud is not." (citations omitted)), *aff'd*, 328 F. App'x 695 (2d Cir. 2009); *Skylon Corp. v. Guilford Mills, Inc.*, No. 93-CV-5581, 1997 WL 88894, at *5–6 (S.D.N.Y. Mar. 3, 1997) (holding that, with respect to a scheme to defraud involving material misrepresentations and allegations of wire fraud and mail fraud, "[n]one of these acts are inherently unlawful, but rather are typical of garden-variety fraud claims").  Because, even assuming Plaintiffs adequately alleged mail fraud and wire fraud predicates, such acts are not inherently unlawful in the RICO context, an ongoing threat is not implied.

In the second category of cases, where an ongoing threat is not implied, "there must be some evidence from which it may be inferred that the predicate acts were the regular way of operating that business, or that the nature of the predicate acts themselves implies a threat of continued criminal activity." *Spool*, 520 F.3d at 185 (internal quotation marks omitted). Plaintiffs have not pled sufficient facts that would allow the Court to plausibly infer anything more than a single scheme that terminated with the 2013 primary election. As alleged in the SAC, the object of the alleged scheme was "to infiltrate and raid the Independence Party in a bid to rig the outcome of the September 10, 2013, countywide Independence Party primary elections." (SAC ¶ 225; *see also* ¶ 100 (alleging that Robert P. Astorino "organized an illicit, fraudulent scheme to rig the outcome of the September 10, 2013, county-wide Independence party primary election by inducing and coercing individuals to switch their party affiliations and enlist in the Independence Party"); *id.* ¶ 108 ("Each and every defendant, with intent to deceive, participated in an illicit, organized[,] and fraudulent scheme to rig the outcome of the September 10, 2013, county-wide Independence Party primary election by inducing and coercing individuals to switch their party affiliations and enlist in the Independence Party.").) Moreover, this scheme, as alleged by Plaintiffs, "has an intended and foreseeable endpoint," and therefore is "inherently terminable" and "will not constitute open-ended continuity." *Dolan v. Fairbanks Capital Corp.*, 930 F. Supp. 2d 396, 409 (E.D.N.Y. 2013); *see also FD Prop. Holding, Inc. v. U.S. Traffic Corp.*, 206 F. Supp. 2d 362, 371 (E.D.N.Y. 2002) (same); *see also GICC Capital Corp. v. Tech. Fin. Grp., Inc.*, 67 F.3d 463, 466 (2d Cir. 1995) ("Even if we assume that defendants' scheme was designed to deprive TFG of its assets, it is clear that the scheme was *inherently* terminable. . . . For example, the predicate acts alleged in connection with the repurchases of residual investor interests—that is, mail and wire fraud—*could not* have

continued once the pool of investor interests available for repurchase was exhausted." (emphasis in original)).  Furthermore, this alleged scheme was cut off with the disenrollment of 4,000 Independence Party members in *Rhoades II*.

Plaintiffs urge the Court to find that the threat of criminal activity is ongoing because one of the objectives, to "'decapitate' the current leadership of the Independence Party," is unaccomplished, and because the scheme "was done to affect future elections as well as to take control of the party . . . ."  (Pls.' Mem. 26.)  Plaintiffs also argue that the scheme was not inherently terminable because it was broader than the election of just one person and the state court's order did not stop the enterprise's ability to resume its activity.  (*Id.* at 27–28.)  When pressed at oral argument, Plaintiffs' counsel merely asserted that the scheme is open-ended because people could still join the Independence Party without being bona fide members.  (*See* June 9, 2015 Oral Argument Tr. 87–90.)  However, Plaintiffs have not alleged sufficient facts plausibly showing that any such activity is ongoing, or that it is being done using wires or mail, and their claim to the contrary is simply speculative.  Therefore, Plaintiffs have failed to adequately plead either a sufficient closed-ended or open-ended pattern of racketeering activity, and this claim must be dismissed.

### iii.  Cognizable Injury

Even setting aside the two problems discussed above, there is a further reason Plaintiffs' § 1962(c) claim must be dismissed.  In order to bring a suit under RICO, each plaintiff must allege injury to his or her business or property caused "by reason of the substantive RICO violation."  *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 91 (2d Cir. 2015) (internal quotation marks omitted).  "This causation analysis will require the district court to identify (1) the property interest that is protected by RICO, as alleged by plaintiffs, and (2) whether the

injury to that interest was caused by the RICO violation." *Id.*; *see also* 18 U.S.C. § 1964(c) ("Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court . . . ."); *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985) ("[T]he plaintiff only has standing if . . . *he* has been injured in *his* business or property by the conduct constituting the violation." (emphases added)). The second part of the analysis requires that the RICO violation was both the proximate cause and the but-for cause of the plaintiffs' injuries. *See UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 132 (2d Cir. 2010). "'When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries.'" *Naples v. Stefanelli*, No. 12-CV-4460, 2015 WL 541489, at *14 (E.D.N.Y. Feb. 7, 2015) (quoting *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006)).

Thus, the Court must first assess whether each Plaintiff has asserted an injury to a property interest protected by RICO. Importantly, RICO only protects injury to the plaintiff's business or property, meaning that many injuries are insufficient to establish RICO standing. Personal damages, emotional damages, and physical damages, for example, are insufficient. *See Angermeir v. Cohen*, 14 F. Supp. 3d 134, 152 (S.D.N.Y. 2014) (holding that assertions that the plaintiffs had to waste time and effort, were subject to annoyance, embarrassment, emotional distress, and mental anguish were insufficient); *Gross v. Waywell*, 628 F. Supp. 2d 475, 488 (S.D.N.Y. 2009) ("[P]ersonal or emotional damages do not qualify."); *Williams v. Dow Chem. Co.*, 255 F. Supp. 2d 219, 225 (S.D.N.Y. 2003) ("RICO provides recovery for injury to business and property; it does not provide recovery for physical and emotional injuries."); *Tsipouras v. W&M Properties, Inc.*, 9 F. Supp. 2d 365, 368 (S.D.N.Y. 1998) ("[M]ere injury to character, business reputation, and/or the intentional infliction of emotional distress are not actionable

under civil RICO.").  Moreover, the deprivation of constitutional rights is a personal injury that is not protected by RICO.  *See Wright v. Szczur*, No. 11-CV-140, 2012 WL 268283, at *4 (W.D.N.Y. Jan. 30, 2012) ("The [plaintiffs] . . . allege only that they suffered personal injuries, including emotional distress and the deprivation of constitutional rights."); *see also Lauter v. Anoufrieva*, 642 F. Supp. 2d 1060, 1085–86 (C.D. Cal. 2009) (holding that the "plaintiff's alleged deprivation of his constitutional rights to file suit and to due process of law are . . . personal in nature" and cannot provide the requisite injury to bring a RICO suit); *McCormick v. City of Lawrence*, 325 F. Supp. 2d 1191, 1209 (D. Kan. 2004) ("RICO only provides damages for injury to business or property.  Although [the] [p]laintiffs claim that their First Amendment rights are 'property' within the meaning of RICO, the court disagrees." (citation omitted)), *aff'd*, 130 F. App'x 987 (10th Cir. 2005).  Rather, the plaintiff "must allege *actual*, quantifiable injury," and "[c]ourts have required that the plaintiff show concrete financial loss in order to show injury under RICO."  *Kerik v. Tacopina*, — F. Supp. 3d —, 2014 WL 6791615, at *12 (S.D.N.Y. Dec. 3, 2014) (internal quotation marks omitted); *see also Makowski*, 2010 WL 3026510, at *12 ("A number of appellate courts have held that a showing of RICO injury requires proof of a concrete financial loss and does not encompass mere injury to a valuable intangible property interest." (internal quotation marks omitted) (quoting *Evans v. City of Chicago*, 434 F.3d 916, 932 (7th Cir. 2006))); *id.* at *13 (holding that loss of intangible rights, such as the right to a democratic union, is not concrete financial loss sufficient to constitute a RICO injury); *Dornberger v. Metro. Life Ins. Co.*, 961 F. Supp. 506, 521 (S.D.N.Y. 1997) ("Under § 1964(c), a plaintiff must be 'injured in his business or property' in order to recover.  This requires a showing of some actual, out-of-pocket financial loss.").  Finally, the loss alleged must be "clear and definite," rather than speculative.  *Am. Home Mortgage Corp. v. UM Sec.*

*Corp.*, No. 05-CV-2279, 2007 WL 1074837, at *4 (S.D.N.Y. Apr. 9, 2007); *see also Jakks Pac.*, 530 F. Supp. 2d at 520 ("Defendants are correct in asserting that a RICO plaintiff may not recover for speculative losses or where the amount of damages is unprovable." (internal quotation marks omitted)).

Following these principles, the Court concludes that Plaintiffs' assertions of injury, (*see* SAC ¶¶ 581–85), are insufficient.  The SAC alleges the following injuries.  First, with respect to the Independence Party, Plaintiffs allege that it has been injured because it "has been unable to earn the money donations it normally secures to elect candidates of their [sic] choice," and its "business of choosing and securing candidates of their [sic] choice that are in sympathy with the principles of the Independence Party has been injured."  With respect to the individual Plaintiffs, the SAC alleges that "[i]ndividual Independence voters were injured when their vote did not count as a result of this Scheme," "jobs were lost on a county level as . . . at least three County Legislators who normally would not have secured the Independence vote, did so and were elected," and Plaintiffs' right to association was impaired.  (*See id.*)

The Court will begin with the injuries asserted with reference to the individual Plaintiffs. The first and third categories of injuries above are personal/constitutional injuries that cannot form the basis of a RICO claim, as noted above.  *See, e.g.*, *Wright*, 2012 WL 268283, at *4.[19] The second category—that "jobs were lost"—is insufficient because Plaintiffs have failed to plead facts connecting these alleged injuries to any RICO violation.  The SAC also alleges that

---

[19] To the extent Plaintiffs argue that *United States v. Bonanno Organized Crime Family of La Cosa Nostra*, 683 F. Supp. 1411 (E.D.N.Y. 1988), *aff'd*, 879 F.2d 20 (2d Cir. 1989), counsels otherwise, (*see* Pls.' Mem. 37–39), they are simply wrong.  That case did not hold that election violations provide injury cognizable under RICO, most obviously because the court held that the government lacked standing for monetary damages under RICO.  *See id.* at 1458.

Drace and Vazquez lost their jobs, and that Cavallo was not reappointed to a volunteer position

on the Westchester County Police Advisory Board.  Specifically, Plaintiffs allege that Drace was

fired because of "her role in the sub-committee hearing held to dis-enroll thousands of newly

added voters to the Independence Party," under the pretextual excuse that she was fired because

she failed a civil service exam.  (SAC ¶ 307.)  With respect to Vazquez, Plaintiffs allege that

Vazquez opposed a plan by Astorino and Gille to demote minority Department of Social

Services workers.  (*Id.* ¶ 293.)  Additionally, the SAC alleges that "by late December 2012,

Vazquez made it clear that the Independence Party would not re-endorse [Astorino] for re-

election to the County Executive's Office."  (*Id.* ¶ 296.)  In retaliation, Astorino transferred

Vazquez to a "non-existent position," and she was terminated thereafter.  (*Id.* ¶¶ 297, 302.)  With

respect to Cavallo, the SAC alleges that in retaliation for Cavallo not endorsing Astorino for the

2013 County Executive Office position, Astorino blocked Cavallo's reappointment to the

Westchester County Police Advisory Board, a non-compensated position.  (*Id.* ¶¶ 276–79.)[20]

These injuries are insufficient because they were not caused *by* any RICO violation.  In

particular, there is no causal connection alleged between the alleged racketeering acts and the

lost jobs.  *See* 18 U.S.C. § 1964(c) (granting standing to a person injured "by reason of a

violation of section 1962); *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 462 (2006) ("[A]

claim is cognizable under § 1964(c) only if the defendant's alleged violation proximately caused

the plaintiff's injury."); *Grewal v. Cuneo*, No. 13-CV-6836, 2015 WL 4103660, at *19

(S.D.N.Y. July 7, 2015) (dismissing RICO claim for lack of standing where the plaintiff's

"injuries were not proximately caused by [d]efendants' alleged violations of the RICO statute");

*Beecher v. Riverdale Riding Corp.*, No. 08-CV-6062, 2010 WL 5298017, at *5 (S.D.N.Y. Dec.

---

[20] The SAC does not allege any specific injury to Zherka.

42

21, 2010) (dismissing RICO claim where the plaintiff's "asserted injuries are too remote and are not directly caused by the alleged RICO violations").  At most, Plaintiffs' claimed injuries were related to the alleged scheme in that these actions represented retaliation by Astorino for opposing the scheme.  However, this too would be insufficient.  Retaliation for failure to participate in and for taking legal action against the alleged scheme to raid the Independence Party is not a cognizable RICO injury.  *See Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 24 (2d Cir. 1990) ("We previously have held that loss of employment (as distinct from loss of commissions) for reporting or refusing to participate in an enterprise engaging in a pattern of racketeering activity is not injury sufficient for standing.  These cases underscore that the purpose of civil RICO liability does not extend to deterring any illegal act such as retaliatory firings for which there are state and common law remedies." (citations omitted)). [21]  And, finally, Cavallo plainly cannot assert any economic injuries from losing his non-compensated position on the Westchester County Police Advisory Board.  Therefore, the individual Plaintiffs have not adequately pled RICO injuries.

The Court next turns to the allegations of injury suffered by the Independence Party.  These, too, are insufficient.  Plaintiffs' allegation that the Party "has been unable to earn the money donations it normally secures to elect candidates of their [sic] choice" lacks the requisite precision necessary to constitute a RICO injury, as "a plaintiff who alleges injuries that are indefinite and unprovable does not have standing under, and cannot recover damages pursuant to, RICO."  *Makowski v. United Bhd. of Carpenters & Joiners of Am.*, No. 08-CV-6150, 2010

---

[21] At oral argument, counsel for Plaintiffs admitted that he had not considered *Hecht*, and all but conceded that it undercut this theory of RICO injury.  (*See* June 9, 2015 Oral Argument Tr. 59–60.)

WL 3026510, at *8 (S.D.N.Y. Aug. 2, 2010) (internal quotation marks omitted); *see also Jakks Pac.*, 530 F. Supp. 2d at 521 (same").[22]  Furthermore, Plaintiffs do not plausibly allege that any racketeering activity, here allegedly enrolling thousands of additional members into the Independence Party, would cause the Party's incoming donations to decrease.  Indeed, the opposite likely would be true.  Moreover, the injury to the Party's "business of choosing and securing candidates of their choice" does not become a business injury simply by virtue of calling it that; what Plaintiffs allege again here is, at most, a non-economic injury, which is not cognizable as a RICO injury.  *See Angermeir*, 14 F. Supp. 3d at 151; *Wright*, 2012 WL 268283, at *4.

In opposition to Defendants' Motions To Dismiss, Plaintiffs argue that they have implicitly alleged that they were injured by virtue of paying attorneys' fees.  (*See* Pls.' Mem. 33–37.)  They argue that this is implicit because they have requested attorneys' fees in the wherefore clause of the SAC, (*see id.* at 34 ("While the SAC did not specifically make legal fees one of the enumerated injuries, it was nonetheless alleged in the wherefore clause where it states clearly we are seeking legal fees for the instant action.")), and they seem to argue that it was obvious that they had to expend legal fees in relation to the state court cases, (*see id.* ("[T]here is no requirement that legal fees be *explicitly* spelled out[;] rather it is axiomatic that legal fees were requested and would be a duly noted injury to the Plaintiffs having to address this RICO claim and having expended monies also in legal fees for the State Court actions (*Rhoades*) they were forced to bring to defend their interest herein.")).  While it is true that in some cases legal fees

---

[22] Where the amount of loss is peculiarly within the knowledge of the defendants, plaintiffs need not allege a dollar amount of loss, *see Trustees of Plumbers & Pipefitters Nat. Pension Fund v. Transworld Mech., Inc.*, 886 F. Supp. 1134, 1146 (S.D.N.Y. 1995), however, this is not such a situation.

can constitute a RICO injury if such fees are proximately caused by the RICO violation, *see*

*Stochastic Decisions, Inc. v. DiDomenico*, 995 F.2d 1158, 1167 (2d Cir. 1993), *Angermeir*, 14 F.

Supp. 3d at 153, Plaintiffs simply have not alleged that they have been injured in that way, nor

have they alleged that such an injury was caused by the alleged RICO violation, and therefore

Plaintiffs do not have standing based on this injury.[23]

For all of the foregoing reasons, Plaintiffs have failed to sufficiently allege a violation of

§ 1962(c), and their claim is dismissed.

### b.  RICO Claim Under 18 U.S.C. § 1962(b)

Plaintiffs also bring a claim under 18 U.S.C. § 1962(b).  Section 1962(b) provides that

"[i]t shall be unlawful for any person through a pattern of racketeering activity or through

collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or

control of any enterprise which is engaged in, or the activities of which affect, interstate or

foreign commerce."  To state a claim under this provision, "the plaintiff must allege that: (1) the

defendants engaged in a pattern of racketeering activity for the purpose of acquiring an interest

in or maintaining control of the enterprise; (2) the defendants in fact acquired an interest in or

maintained control of the enterprise through a pattern of racketeering activity; and (3) the

plaintiff suffered an injury as a result of the acquisition or control, separate and apart from any

injuries attributable to the individual predicate acts of racketeering.  *Cont'l Fin. Co. v. Ledwith*,

No. 08 CIV. 7272, 2009 WL 1748875, at *4 (S.D.N.Y. June 22, 2009).

---

[23] Specifically, Plaintiffs have not alleged that *they* expended any legal fees in *Rhoades I* or *Rhoades II*.  Rhoades, who is not a Plaintiff in this case, was the only petitioner in *Rhoades I*, (*see* SAC Ex. H1), and although Cavallo, Vazquez, Drace, and the Independence Party of Westchester County were petitioners in *Rhoades II*, (*see* SAC Ex. H2), they were not the only petitioners.

"Under any prong of § 1962, a plaintiff in a civil RICO suit must establish a pattern of

racketeering activity.  The plaintiff must plead at least two predicate acts, and must show that the

predicate acts are related and that they amount to, or pose a threat of, continuing criminal

activity."  *GICC*, 67 F.3d at 465 (citation and internal quotation marks omitted); *see also Jus

Punjabi, LLC v. Get Punjabi Inc.*, No. 14-CV-3318, 2015 WL 2400182, at *4 (S.D.N.Y. May 20,

2015) (same); *O'Neill v. Hernandez*, No. 08-CV-1689, 2010 WL 1257512, at *9 (S.D.N.Y. Mar.

25, 2010) ("To state a RICO claim under [§] 1962(b) and (c), a plaintiff must plead seven

elements: (1) that a defendant, (2) through the commission of two or more acts (3) constituting a

pattern (4) of racketeering activity, (5) directly or indirectly invests in, or maintains an interest

in, or participates in, (6) an enterprise, (7) the activities of which affect interstate or foreign

commerce."); *Jordan (Bermuda) Inv. Co. v. Hunter Green Invs. Ltd.*, 205 F. Supp. 2d 243, 250

(S.D.N.Y. 2002) (noting that, as under § 1962(c), to state a claim under § 1962(b), a plaintiff

"must allege at least two predicate acts, and those acts must constitute a 'pattern' of racketeering

activity," which pattern could be either open-ended or closed-ended).  As discussed in detail

above, Plaintiffs do not plausibly allege the RICO predicates or the existence of either an open-

ended or closed-ended pattern of RICO, and the § 1962(b) claim, like the § 1962(c) claim, must

be dismissed.  *See, e.g.*, *Kilkenny*, 2012 WL 1638326, at *6 (noting that a § 1962(b) claim would

fail for the same reason as the § 1962(c) claim—that the plaintiff did not adequately plead any

RICO predicates and that he did not plead a closed-ended or open-ended pattern); *Curtis &

Assocs., P.C. v. Law Offices of David M. Bushman, Esq.*, 758 F. Supp. 2d 153, 168 (E.D.N.Y.

2010) (dismissing § 1962(b) and § 1962(c) claims "because [the] plaintiffs . . . failed as a matter

of law to plead any underlying predicate acts which could form the basis for a pattern of

racketeering activity" (internal quotation marks omitted)), *aff'd sub nom. Curtis v. Law Offices of*

*David M. Bushman, Esq.*, 443 F. App'x 582 (2d Cir. 2011); *Mikhlin v. HSBC*, No. 08-CV-1302, 2009 WL 485667, at *5 (E.D.N.Y. Feb. 26, 2009) (dismissing § 1962(b) and § 1962(c) claims on the alternative basis that the plaintiffs failed to allege a pattern of racketeering activity); *Stein v. N.Y. Stair Cushion Co.*, No. 04-CV-4741, 2006 WL 319300, at *9 (E.D.N.Y. Feb. 10, 2006) (dismissing a § 1962(b) claim after dismissing a § 1962(c) claim because "the [c]ourt ha[d] already determined that [the] [p]laintiff ha[d] failed to plead a pattern of racketeering activity").

Additionally, as discussed above, to have standing to bring a RICO claim, a plaintiff must "allege injury to her business or property." *S. Ill. Laborers' & Employers Health & Welfare Fund v. Pfizer Inc.*, No. 08-CV-5175, 2009 WL 3151807, at *4 (S.D.N.Y. Sept. 30, 2009); *see also* 18 U.S.C. § 1964(c) (providing that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue"); *DeFalco v. Bernas*, 244 F.3d 286, 305 (2d Cir. 2001) (noting that to bring a claim under any substantive RICO provision, a plaintiff must allege injury to business or property). To state a claim under § 1962(b), the RICO injury must have been caused by the acquisition or maintenance of control in an enterprise. *See Fischbein v. Sayers*, No. 04-CV-6589, 2009 WL 2170349, at *5 (S.D.N.Y. July 16, 2009) (finding that the plaintiff could not state a cause of action under § 1962(b) because "the [c]omplaint does not even attempt to allege any injury arising from the acquisition or maintenance of an enterprise . . . ."). As discussed above, the alleged injuries of individual Independence Party voters when their votes did not count and to Plaintiffs' associational rights being impaired are personal/constitutional injuries that cannot constitute injury to business or property. With respect to Drace's and Vazquez's alleged job losses and the failure to reappoint Cavallo to the Westchester County Police Advisory Board, (*see* SAC ¶¶ 267–78, 293, 296–97, 302, 305–08), there is no allegation that these injuries were caused by Defendants' acquisition or

47

maintenance of control of the Independence Party.  Finally, as discussed above, the alleged inability of the Independence Party to collect donations is too speculative and conclusory to state a cognizable RICO injury.  *See Miller v. Carpinello*, No. 06-CV-12940, 2007 WL 4207282, at *6 (S.D.N.Y. Nov. 20, 2007) ("A plaintiff has standing to bring a RICO claim only if he has been injured in his business or property by the conduct constituting the RICO violation and only when his actual loss is clear and definite."); *Dornberger*, 961 F. Supp. at 521 (holding that injury to business or property "requires a showing of some actual, out-of-pocket financial loss").

And finally, the Court holds that Plaintiffs have abandoned their § 1962(b) claim, as several Defendants moved to dismiss this claim, (*see* Dkt. No. 230 at 17; Dkt. No. 238 at 8–9; Dkt. No. 246 at 20; Dkt. No. 252 at 20–21), and Plaintiffs did not oppose its dismissal, (*see generally* Pls.' Mem.).  *See Tieman v. City of Newburgh*, No. 13-CV-4178, 2015 WL 1379652, at *15 n.10 (S.D.N.Y. Mar. 26, 2015) (holding that the plaintiff abandoned a claim when he did not respond to the defendant's arguments in support of its motion to dismiss); *Liang v. City of New York*, No. 10-CV-3089, 2014 WL 4966074, at *1 n.1 (E.D.N.Y. Oct. 3, 2014) (deeming abandoned and dismissing RICO claim against certain defendants where the plaintiff did not respond to their arguments in support of their motion to dismiss); *Wright v. Brae Burn Country Club, Inc.*, No. 08-CV-3172, 2009 WL 725012, at *5 (S.D.N.Y. Mar. 20, 2009) (deeming abandoned and dismissing the plaintiffs' RICO claim where the plaintiffs failed to address the defendants arguments about that claim).  This abandonment constitutes another independent ground for dismissal.  For the foregoing reasons, therefore, Plaintiffs' § 1962(b) claim is dismissed.

c.  RICO Conspiracy

Finally, Plaintiffs also bring a RICO conspiracy claim under 18 U.S.C. § 1962(d).  This section provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c), of this section."  Although Plaintiffs did not set out a RICO conspiracy claim as a separate claim for relief in the SAC, they nonetheless urge that they have adequately pleaded a violation of § 1962(d).  (*See* Pls.' Mem. 15–17.)  However, because Plaintiffs have not adequately pleaded a substantive RICO violation, "the conspiracy claim under § 1962(d) also fails."  *BWP Media USA Inc. v. Hollywood Fan Sites, LLC*, 69 F. Supp. 3d 342, 363 (S.D.N.Y. 2014); *see also First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 182 (2d Cir. 2004) ("[B]ecause [the] [p]laintiffs did not adequately allege a substantive violation of RICO in [c]ount [f]ive on the part of either [defendant], the [d]istrict [c]ourt properly dismissed [c]ount [s]ix, which alleged a RICO conspiracy in violation of 18 U.S.C. § 1962(d)."); *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1191 (3d Cir. 1993) ("Any claim under section 1962(d) based on a conspiracy to violate the other subsections of section 1962 necessarily must fail if the substantive claims are themselves deficient."); *Reich v. Lopez*, 38 F. Supp. 3d 436, 453 (S.D.N.Y. 2014) ("As [the] [p]laintiffs have not adequately pleaded a substantive RICO violation, their conspiracy claim under 18 U.S.C. § 1962(d) is also dismissed."), *reconsideration denied,* No. 13-CV-5307, 2015 WL 1632332 (S.D.N.Y. Apr. 13, 2015); *Nat'l Grp. for Commc'ns & Computers Ltd. v. Lucent Techs. Inc.*, 420 F. Supp. 2d 253, 272 (S.D.N.Y. 2006) ("Case law in [the Second] Circuit confirms that a 1962(d) conspiracy claim must be dismissed where the substantive RICO claim is deficient.") (collecting cases).  And there are no additional allegations with respect to the conspiracy count that the Defendants agreed to commit further acts that, had they been carried out, would have satisfied the RICO elements that the Court has

held were deficient with respect to the substantive RICO counts. *See Li Jun An*, 2013 WL
6503513, at *11 ("Where 'there is insufficient evidence that the [defendants] actually committed
predicate acts displaying the continuity necessary to support a substantive RICO violation,' and
'no evidence that defendants agreed to perform additional acts that, if committed, would have
displayed continuity sufficient to establish a pattern of racketeering activity,' a RICO conspiracy
claim must fail.  Here, [the plaintiff] has failed to state a substantive RICO claim under 18
U.S.C. § 1962(c), and has made no additional allegations in pleading a RICO conspiracy claim."
(quoting *Cofacredit,* 187 F.3d at 245)); *see also Salinas v. United States*, 522 U.S. 52, 65 (1997)
("A conspirator must intend to further an endeavor which, if completed, would satisfy all of the
elements of a substantive criminal offense . . . ."); *BWP Media USA*, 2014 WL 6077247, at *15
("Further, [the] [p]laintiffs have made no additional allegations in pleading a RICO conspiracy
claim." (internal quotation marks omitted)).  Therefore, the RICO conspiracy claim is dismissed.

### 2.  Constitutional Claims

Plaintiffs also assert a variety of constitutional claims.  Specifically, Plaintiffs allege that
Defendants' actions violated Plaintiffs' rights under the Equal Protection Clause, (*see* SAC
¶ 620), the Due Process Clause, (*see* SAC ¶ 619), and the First Amendment, (*see* SAC ¶¶ 617–
18).  When analyzing Plaintiffs' constitutional claims, it is important to understand what they are
and are not claiming.  Plaintiffs do not argue that the election laws, themselves, are
unconstitutional.  Rather, what they allege is that municipal actors, and private actors working in
concert with those municipal actors, violated the election laws in a way that hurt Plaintiffs—by
registering people who were not in sympathy with the Independence Party, accepting the late
filing of petitions, falsely notarizing signatures on voter registration applications, and backdating
applications that were submitted past the deadlines.  Moreover, it is clear from Plaintiffs'

Opposition that they are not bringing constitutional claims based on employment actions taken against individual Plaintiffs.[24]  Finally, in deciding Plaintiffs' constitutional claims on the grounds discussed below, the Court notes that, by failing to address each of the elements of the claims, it does not mean to imply that Plaintiffs adequately alleged the elements that are not addressed.[25]

### a.  Equal Protection Claim

First, Plaintiffs assert that their right to equal protection has been violated.  "The Equal Protection Clause generally protects individuals from state action which causes them to be treated differently from others similarly situated."  *Willingham v. Cty. of Albany*, 593 F. Supp. 2d 446, 460 (N.D.N.Y. 2006).  Plaintiffs do not specify under what theory they bring this equal protection claim, but they appear to allege that they were discriminated against as members of a political group.

Although Plaintiffs may have adequately alleged a violation of New York Election law, "[i]t is axiomatic that violations of state law alone are insufficient to state a claim for section 1983 relief."  *Weiss v. Inc. Vill. of Sag Harbor*, 762 F. Supp. 2d 560, 573 (E.D.N.Y. 2011) (alteration in original) (internal quotation marks omitted) (quoting *Powers v. Coe,* 728 F.2d 97, 105 (2d Cir. 1984)).  "The mere fact that a case may involve voting rights or political elections does not change this analysis."  *Id.* (citing *Kasper v. Bd. Of Election Comm'rs of the City of*

---

[24] Indeed, the adverse employment actions allegedly taken against Vazquez, as alleged in the SAC, were already addressed in a different lawsuit in this district.  (*See* Decl. of Mark A. Radi ("Radi Decl.") Exs. H (Docket), I (Complaint), J (Court Tr.) (Dkt. No. 229).)

[25] Defendants forcefully argue, for example, that Plaintiffs have not adequately alleged that actions were taken under state law.  It is questionable that Plaintiffs sufficiently alleged this element of a § 1983 claim with respect to all of the Defendants.  However, because the Court dismisses the § 1983 claims on other grounds, it need not reach this issue.

*Chicago*, 814 F.2d 332, 342 (7th Cir. 1987)); *see also Snowden v. Hughes*, 321 U.S. 1, 11 (1944) ("Mere violation of a state statute does not infringe the federal Constitution. . . . A state statute which provided that one nominee rather than two should be certified in a particular election district would not be unconstitutional on its face and would be open to attack only if it were shown, as it is not here, that the exclusion of one and the election of another were invidious and purposely discriminatory.").  Thus, more is needed for Plaintiffs to state a claim for equal protection based on state actors allegedly violating New York election law.

First, "[l]aws that by their own terms burden the fundamental rights of minority groups raise particular concerns of invidious discrimination, and those concerns are no less acute where the minority group is defined by shared political values rather than racial or ethnic characteristics."  *Green Party of State of N.Y. v. Weiner*, 216 F. Supp. 2d 176, 188 (S.D.N.Y. 2002) (holding that such laws are subject to strict scrutiny).  However, Plaintiffs do not allege that any law itself burdened Independence Party members' voting rights.  Rather, Plaintiffs argue that the election laws were applied incorrectly by certain Defendants who allegedly allowed late filings and back-dated voter registration applications, and who orchestrated the alleged raid of the Independence Party.  "Uneven or erroneous application of an otherwise valid statute constitutes a denial of equal protection only if it represents 'intentional or purposeful discrimination.'"  *Powell v. Power*, 436 F.2d 84, 88 (2d Cir. 1970) (quoting *Snowden*, 321 U.S. at 8); *see also Gelb v. Bd. of Elections of City of New York*, 224 F.3d 149, 154 (2d Cir. 2010), *certified question accepted*, 738 N.E.2d 361 (N.Y. 2000) ("It is thirty-year-old doctrine in this Circuit that a § 1983 action invoking the Equal Protection Clause is not available to remedy election process errors in the absence of a showing of 'intentional or purposeful discrimination.'" (quoting *Powell v. Power*, 436 F.2d 84, 88 (2d Cir. 1970))); *Gold*, 101 F.3d at 800 (describing

*Powell v. Power*, 436 F.2d 84 (2d Cir. 1970), as holding that "a § 1983 action to remedy errors in the election process allegedly violating the equal protection clause does not exist unless the state action constituted intentional or purposeful discrimination" (internal quotation marks omitted)); *Diaz v. N.Y.C. Bd. Of Elections*, 335 F. Supp. 2d 364, 367 (E.D.N.Y. 2004) (noting that courts have required intentional or purposeful discrimination to sustain a § 1983 claim based on errors in the election process); *Dill v. Lake Pleasant Cent. Sch. Dist.*, 205 F. Supp. 2d 24, 33 (N.D.N.Y. 2002) ("It is well-established, at least under New York Election Law, that 'a § 1983 action to remedy errors in the election process allegedly violating the equal protection clause does not exist unless the state action constituted intentional or purposeful discrimination.'" (some internal quotation marks omitted) (quoting *Gold v. Feinberg*, 101 F.3d 796, 800 (2d Cir. 1996)); *cf. Hudson v. New York City*, 271 F.3d 62, 68 (2d Cir. 2001) ("[The] plaintiffs need only demonstrate intent where the underlying constitutional deprivation, such as an equal protection violation under the Fourteenth Amendment, calls for it.").

There are two requirements for a plaintiff to assert an equal protection claim under the theory that members of their political group were denied certain rights: first, he must allege that his group was treated differently, and second, he must allege that this differential treatment was done with discriminatory intent. Here, Plaintiffs have failed to meet the first requirement because they simply make no allegation whatsoever that any other political group was treated differently. This, in itself, is fatal to any equal protection claim, as "[t]o establish . . . intentional or purposeful discrimination, it is axiomatic that a plaintiff must allege that similarly situated persons have been treated differently." *Marchant v. N.Y.C. Bd. of Elections*, No. 13-CV-5493, 2013 WL 4407098, at *4–5 (S.D.N.Y. Aug. 16, 2013) (internal quotation marks omitted) (quoting *Gagliardi v. Village of Pawling*, 18 F.3d 188, 193 (2d Cir. 1994)); *see also Willingham*,

593 F. Supp. 2d at 460 ("[A]n equal protection claim requires proof that an identifiable group was treated differently and that such treatment was both intentional and unreasonable.  The Equal Protection Clause does in fact protect against discrimination based on race, but it is intentional differential treatment, not simply racially discriminatory motivation, which is required to be shown." (citation omitted)); *cf. Yale Auto Parts, Inc. v. Johnson*, 758 F.2d 54, 61 (2d Cir. 1985) ("[The] [p]laintiffs' brief states only that defendant Frederick Johnson's statement to [the zoning board of appeals] members that he wanted the [plaintiff's] application killed amounts to singling out a particular applicant for arbitrary treatment without respect to the statutory criteria which the equal protection clause forbids.  This is wholly insufficient to state an equal protection claim, absent the essential allegation that others were treated differently." (citation and internal quotation marks omitted)); *Lewis v. Gallivan*, 315 F. Supp. 2d 313, 316 (W.D.N.Y. 2004) ("To state an equal protection claim, a plaintiff must charge a governmental officer not only with deliberately interpreting a statute against the plaintiff, but also with singling him out alone for that misinterpretation.  To establish such intentional or purposeful discrimination, it is axiomatic that a plaintiff must allege that similarly situated persons have been treated differently." (citations and internal quotation marks omitted)); *Tshaka v. Benepe*, No. 02-CV-5580, 2003 WL 21243017, at *3 (E.D.N.Y. Apr. 9, 2003) ("An equal protection claim essentially has two elements: (1) the plaintiff was treated differently from others similarly situated, and (2) this differential treatment was motivated by an intent to discriminate on the basis of an impermissible consideration, such as race, religion, intent to inhibit or punish the exercise of constitutional rights or bad faith intent to injure.").  There are simply no such

allegations here.[26]  Moreover, there is no allegation that the alleged conduct of Defendants of

improperly allowing voters to register as Independence Party members was intended to

discriminate against other Independence Party members.  Rather, Plaintiffs' theory is that

Defendants were attempting to add Independence Party voters in an effort to help Astorino win

reelection.  This theory does not present an equal protection claim.  Plaintiffs' equal protection

claim therefore must be dismissed.

### b. Due Process Claim

Next, Plaintiffs claim that their due process rights were violated.  It is unclear from the

SAC whether Plaintiffs seek to allege a procedural or substantive due process claim, but in their

opposition, Plaintiffs appear to treat this as a procedural due process claim, and the Court will

follow suit.  (*See* Pls.' Mem. 48–49 (arguing that the remedies provided to remedy the alleged

raid were insufficient).)[27]

---

[26] There are no factual allegations in the SAC that others who were similarly situated in all material respects were treated differently, for example that the election officials did not violate election law by allowing late registration and backdating applications with respect to people registering to vote in other parties' primaries or that they did not register people into other parties who were not in sympathy with the principles of those parties.

[27] To the extent that Plaintiffs seek to raise a substantive due process claim in addition to a procedural due process claim, this claim is foreclosed because the conduct at issue is covered by Plaintiffs' procedural due process, equal protection, and First Amendment claims.  *See Wilson v. Birnberg*, 667 F.3d 591, 599 (5th Cir. 2012) (dismissing substantive due process claim based on election-related conduct because the "claims are rooted in procedural due process, the Equal Protection Clause, and the First Amendment," and those provisions therefore "are [the court's] exclusive guideposts"); *Velez v. Levy*, 401 F.3d 75, 94 (2d Cir. 2005) ("[W]here a specific constitutional provision prohibits government action, plaintiffs seeking redress for prohibited conduct in a § 1983 suit cannot make reference to the broad notion of substantive due process."); *Tenenbaum v. Williams*, 193 F.3d 581, 599 (2d Cir. 1999) ("The Supreme Court has held that '[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.'" (some internal quotation marks omitted) (quoting *Albright v. Oliver*, 510 U.S. 266, 266 (1994) (plurality opinion))); *Miller v. N.Y.C. Dep't of Educ.*, 71 F. Supp. 3d 376, 385 (S.D.N.Y. 2014)

"The Due Process Clause does not protect against all deprivations of constitutionally protected interests in life, liberty, or property, 'only against deprivations without due process of law.'" *Rivera-Powell v. N.Y.C. Bd. of Elections*, 470 F.3d 458, 464 (2d Cir. 2006) (quoting *Parratt v. Taylor,* 451 U.S. 527, 537 (1981), *overruled in part on other grounds by Daniels v. Williams,* 474 U.S. 327, 330–31 (1986)). "'[T]o determine whether a constitutional violation has occurred, it is necessary to ask what process the State provided, and whether it was constitutionally adequate.'" *Id.* at 465 (alteration in original) (quoting *Zinermon v. Burch,* 494 U.S. 113, 126 (1990)). In considering what process is due, the Supreme Court has distinguished between claims based on state law or procedure, and claims based on illicit or unauthorized acts of state employees. *Id.* at 464. In the latter category, a state can avoid liability if it provides a "meaningful post-deprivation remedy." *Id.*; *see also Hellenic Am. Neighborhood Action Comm. v. City of New York*, 101 F.3d 877, 880 (2d Cir. 1996) ("In the . . . case [of claims based on random, unauthorized acts by state employees], the Due Process Clause of the Fourteenth Amendment is not violated when a state employee intentionally deprives an individual of property or liberty, so long as the State provides a meaningful postdeprivation remedy.").[28]

_____

("What is allegedly shocking about what the defendants did is either their intent to violate [the] plaintiff's fundamental First Amendment rights, or their motive to deprive him of liberty without procedural due process. In other words, what would serve to raise defendants' actions beyond the wrongful to the unconscionable and shocking are facts which, if proven, would constitute, in themselves, specific constitutional violations. As [the] plaintiff has sought redress for these constitutional violations elsewhere in the complaint, his substantive due process claim must fail." (citation, alteration, and internal quotation marks omitted)).

[28] "[W]hen the deprivation is pursuant to an established state procedure, the state can predict when it will occur and is in the position to provide a pre-deprivation hearing[;]" thus, the "availability of post-deprivation procedures will not, *ipso facto*, satisfy due process." *Rivera-Powell*, 470 F.3d at 465 (internal quotation marks omitted); *see also Hellenic Am. Neighborhood Action Comm.*, 101 F.3d at 880 ("When the deprivation occurs in the more structured environment of established state procedures, rather than random acts, the availability of

Thus, to state a cognizable due process claim arising out of election misconduct resulting from unauthorized acts of state employees, a plaintiff must first allege (and later establish) *intentional* conduct, as opposed to mere negligence. *Shannon v. Jacobowitz*, 394 F.3d 90, 95–96 (2d Cir. 2005). Second, the plaintiff must allege that no fair and adequate state remedy exists. *Id.* at 97. Here, the Court presumes that Plaintiffs have sufficiently alleged that Defendants intended to take the actions in question, rather than, for example, allowing improper or late applications to be accepted through their negligence. Therefore, the Court turns to the second consideration, the remedial process afforded by the state. Plaintiffs argue that the state methods for redress were inadequate, relying on two citations, *Rosario v. Rockefeller*, 410 U.S. 752 (1973), and a legal brief in a case in New York state court.[29] (Pls.' Mem. 2, 48–49.) The Court is unpersuaded.

New York law provides a mechanism for removing members from political parties who are not in sympathy with the principles of the party. Specifically, under New York Election Law § 16-110, an enrolled member of the party may make a complaint about another voter, and then the chairman of the party county committee with which the voter is registered can hold a hearing,

---

postdeprivation procedures will not, ipso facto, satisfy due process."). However, Plaintiffs are not making any such claim here.

[29] Plaintiffs quote the latter document as describing *Rosario* as holding that the New York State "disenrollment statute is too cumbersome and virtually ineffectual in the face of a large-scale raiding." (Pls.' Mem. 49.) The citation to this document, as stated in Plaintiffs' brief, is "*In the Matter of the Application of Edward M. WALSH, Jr., individually and as Chair of the Suffolk County Committee of the Conservative Party, Petitioners-Appellants, v. Joseph VERDI and Robert and Robert L. Elrose, Sr., enrollees in the Conservative Party and 631 other enrollees in the Conservative Party identified and set forth on a schedule attached hereto and made a Part hereof, the Suffolk County Committee of the Conservative Party of New York State, Richard*, 2011 WL 11673249 (2nd Dept. 2011)." (*Id.*) This citation misleadingly suggests that Plaintiffs are citing to the Second Department's decision. In fact, as noted above, they are citing to one party's brief, which is obviously not legal authority of any kind. The Second Department's decision in the related case said nothing about *Rosario*, and merely affirmed a dismissal of a petition to disenroll certain individuals from the Conservative Party. *See Walsh v. Verdi*, 931 N.Y.S.2d 887 (App. Div. 2011).

after giving at least two days' notice, and determine that the voter is not in sympathy with the principles of the party. *Id.* § 16-110(2).  A duly enrolled member of the party may then bring suit in New York Supreme Court at least 10 days before the primary, and the Court "shall direct the enrollment of such voter to be cancelled if it appears from the proceedings before such chairman or sub-committee, and other proofs, if any, presented, that such determination is just." *Id.*  Thus, to the extent that any state actor intentionally intended to impair any interest or right of Plaintiffs by raiding the Independence Party, state law provided a remedy by permitting Plaintiffs to bring an action to remove those individuals from the Party.  Indeed, Plaintiffs followed this procedure and removed close to 4,000 individuals from the Independence Party rolls by pursuing state-law remedies in state court.  (*See* SAC ¶ 321.)  That Plaintiffs apparently did not take action in time to remove the 4,000 individuals before the September 2013 primary, (*see* SAC ¶¶ 159–69), does not indicate that a meaningful remedy was not provided by the state.  *See Rivera-Powell*, 470 F.3d at 468 n.9 ("The fact that [the plaintiff] failed properly to pursue the state court action, and that it is now too late to do so, does not affect our due process analysis: had she appealed the dismissal of her petition, the state courts would have had an opportunity to clarify when a verified petition is in fact required, and could have decided to accord [the plaintiff] the process she now seeks.  Where a state law remedy gives a party 'a meaningful opportunity to challenge' the state's action, 'he [is] not deprived of due process simply because he failed to avail himself of the opportunity.'" (quoting *Giglio v. Dunn*, 732 F.2d 1133, 1335 (2d Cir. 1984))); *Dekom v. Nassau Cty.*, No. 12-CV-3473, 2013 WL 5278019, at *8 (E.D.N.Y. Sept. 18, 2013) ("[T]hat [the] [p]laintiffs failed to avail themselves of a [§] 16–102 proceeding is of no

moment.  What is significant is that they could have done so if they had chosen." (citations omitted)), *aff'd*, 595 F. App'x 12 (2d Cir. 2014). [30]

Plaintiffs argue that *Rosario* holds that the state procedures at issue are inadequate.  The Court disagrees.  In *Rosario*, the Supreme Court heard a challenge to the New York Election Law that required voters to register for a primary thirty days before the preceding general election.  410 U.S. at 756.[31]  The opponents of the law argued that "New York already has less drastic means to prevent raiding," pointing to the state election law provision that allows party enrollment of voters to be challenged.  In considering this argument, the Supreme Court reasoned that "[e]very challenge to a would-be raider requires a full administrative and judicial inquiry[,] [that] proof that the challenge voter is not in sympathy with the party's principles demands inquiry into the voter's mind[,] and [that] even if the challenge is successful, it strikes from the enrollment books only one name at a time," thereby concluding that, "[i]n the face of large-scale raiding, [the provision allowing for challenges to individuals] *alone* would be virtually ineffectual."  *Id.* at 762 n.10 (emphasis added).  This certainly does not amount to the Supreme Court holding, as Plaintiffs argue, that the provisions requiring voters to register for a party approximately one month before the preceding general election and providing a mechanism for party members to oust non-bona fide members in judicial proceedings together do not provide a meaningful post-deprivation remedy.  Indeed, it is hard for the Court to determine how the state

---

[30] Plaintiffs allege that the improper enrollments were done at the midnight hour before the October 12, 2012 deadline.  (SAC ¶ 71.)  However, Plaintiffs did not bring their lawsuit until July 31, 2013, more than nine months later.  (*Id.* ¶ 116.)

[31] As noted above, the deadline for switching party affiliations to be able to vote in a primary election is currently 25 days before the preceding general election.  N.Y. Elec. Law § 5-304(3).

law remedies do not satisfy Plaintiff's concerns, as they provided Plaintiffs the opportunity to remove 4,000 voters from the Independence Party rolls.  (*See* SAC ¶ 321.)

In addition to their voting rights being diluted, Plaintiffs allege that they suffered other injuries that were not redressed, namely a decreased ability to collect campaign contributions, reputational harm, and electoral losses.  However, "[t]he Fourteenth Amendment due process guarantee . . . only extends to property claims to which an individual has a legitimate claim of entitlement."  *N.Y. State Nat'l Org. for Women v. Pataki*, 261 F.3d 156, 164 (2d Cir. 2001) (internal quotation marks omitted).  Thus, "a purely speculative property interest," for example, a possible future license, cannot be the property interest at the root of a due process claim.  *Spinelli v. City of New York*, 579 F.3d 160, 169 (2d Cir. 2009) (noting that "[w]hile a possible future license involves a purely speculative property interest, once the government has granted a business license to an individual, the government cannot deprive the individual of such an interest without appropriate procedural safeguards" (alterations and internal quotation marks omitted)).  For that reason, the Due Process Clause does not protect the right to *win* an election or the right to receive campaign contributions that Plaintiffs surmise that they would receive in the future because those interests are purely speculative.[32]  *See Flinn v. Gordon*, 775 F.2d 1551, 1554 (11th Cir. 1985) ("Although [the plaintiff] certainly had a constitutional right to run for office and to hold office once elected, he had no constitutional right to win an election.");

---

[32] Plaintiffs argue that their property rights were impaired because "[p]olitical parties have a right to fundraise and any unlawful interference with this right is a deprivation of the parties' property rights."  (Pl.'s Mem. 47.)  That may well be, but Plaintiffs do not allege that their capacity to fundraise was restricted in any way, but merely that the amount of contributions they received decreased.  (*See, e.g.*, SAC ¶ 110 (alleging that "the Independence Party of Westchester County has been damaged by this raid in its ability to raise funds"); Pl.'s Mem. 47 (arguing that the Party's fundraising ability decreased).)  Indeed, it bears noting that this claim is woefully conclusory, as it contains no specifics about the actual fundraising by the Independence Party before and after the alleged raid.

*Emanuele v. Town of Greenville*, 143 F. Supp. 2d 325, 333 (S.D.N.Y. 2001) (holding that there is no "property or liberty interest in being elected"); *Lahaza v. Azeff*, 790 F. Supp. 88, 92 (E.D. Pa. 1992) (rejecting a due process claim based on an alleged conspiracy to bring criminal charges against an individual to prevent him from winning a primary election because "there is no federally protected right to win election to public office").  Finally, with respect to any reputational harms alleged as to the Westchester Independence Party, this also does not form the basis of a due process violation because a "person's interest in reputation alone is not a 'liberty' guaranteed against state deprivation without due process of law.  *Emanuele*, 143 F. Supp. 2d at 334 (citing *Paul v. Davis*, 424 U.S. 693, 693 (1976)); *see also Patterson v. City of Utica*, 370 F.3d 322, 329–30 (2d Cir. 2004) ("A person's interest in his or her good reputation alone, apart from a more tangible interest, is not a liberty or property interest sufficient to invoke the procedural protections of the Due Process Clause or create a cause of action under § 1983.").  To establish a due process claim based on reputational injury, it must be coupled with something more, often a loss of government employment, or otherwise defamation "in the course of termination of some other legal right or status."  *Ass'n of Proprietary Colleges v. Duncan*, — F. Supp. 3d —, 2015 WL 3404190, at *9 (S.D.N.Y. May 27, 2015) (alteration and internal quotation marks omitted).  It is not clear that Plaintiffs allege any reputational injury, but even assuming they did, it did not come in the context of the termination of another legal right to the Westchester Independence Party.  For the foregoing reasons, Plaintiffs' due process claim is dismissed.

### c.  First Amendment Claim

Plaintiffs allege that Defendants impaired Plaintiffs' First Amendment right to free association.  (*See* SAC ¶¶ 617–18.)  In an election case, where a plaintiff alleges a First

Amendment claim based on the violation of election law by state actors, rather than alleging that the election law itself is unconstitutional, the First Amendment analysis converges with the due process analysis.  As the Second Circuit has explained, "[w]hen, as here, a plaintiff challenges a Board of Election decision [or the decision of other state actors relating to the election] not as stemming from a constitutionally or statutorily invalid law or regulation, but rather as contravening a law or regulation whose validity the plaintiff does not contest, there is no independent burden on First Amendment rights when the state provides adequate procedures by which to remedy the alleged illegality." *Rivera-Powell*, 470 F.3d at 469.  In this case, as in *Rivera-Powell*, Plaintiffs' First Amendment claim is indistinguishable from their due process claim because Plaintiffs allege no different facts for their First Amendment claim and again rely on the allegedly illegal application of valid state election laws.  *See id.* at 469 (explaining that because the plaintiff did not challenge any state laws, or the official rules of the board of election, the plaintiff's "First Amendment claim [was] inextricably intertwined with the question of whether the state afforded her procedurally adequate process").  "Because, for the reasons discussed above, [Plaintiffs'] due process claim fails, their First Amendment claim likewise fails."  *Id.* at 470; *see also Dekom*, 2013 WL 5278019, at *8 (dismissing a First Amendment claim based on a violation of election law by state actors because that claim was virtually indistinguishable from the due process claim, and the process provided was sufficient); *Marchant*, 2013 WL 4407098, at *4 (same); *Tiraco*, 963 F. Supp. 2d at 198 (same).  Therefore, Plaintiffs' First Amendment claim is dismissed.

### d.  § 1983 Conspiracy

Because Plaintiffs' substantive constitutional claims fail, their § 1983 conspiracy claim must also be dismissed.  *See Droz v. McCadden*, 580 F.3d 106, 109 (2d Cir. 2009) ("Because

neither of the underlying [§] 1983 causes of action can be established, the claim for conspiracy also fails."); *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995) ("The district court dismissed this claim on the ground that a plaintiff alleging a § 1983 conspiracy claim must prove an actual violation of constitutional rights.  In this we agree.").

### 3.  State Law Claims

Finally, Plaintiffs assert a claim for breach of fiduciary duty under state law.  Because the Court dismisses all of Plaintiffs' federal claims, it declines to exercise supplemental jurisdiction over Plaintiffs' state law claims.  *See United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.").[33]

### III.  Conclusion

For the following reasons, Defendants' Motions To Dismiss are granted.  To the extent that Defendants move for attorneys' fees in connection with the instant action, (*see* Dkt. No. 237), this Motion is denied without prejudice in connection with the Court's previous ruling that all the substantive motions to dismiss would be addressed before turning to any possible motions for sanctions and fees, (*see* Dkt. No. 261).  The Clerk of the Court is respectfully directed to

---

[33] The Court notes that Plaintiffs did not respond to Defendants' Motions To Dismiss this claim, asserting that they forgot to do so.  In any event, the Court need not, and therefore, will not address this state cause of action.  (*See* June 9, 2015 Oral Argument Tr. 34.)

terminate the pending Motions, (*see* Dkt. Nos. 207, 220, 227, 232, 236, 237, 241, 250), and to

close this case.[34]

SO ORDERED.

Dated: October 8 , 2015
    White Plains, New York

             KENNETH M. KARAS
             UNITED STATES DISTRICT JUDGE

---

[34] The Motions are dismissed with prejudice, as the remaining Plaintiffs are represented by counsel, and have already twice been permitted to amend their Complaint. *See, e.g.*, *Seymore v. Dep't of Corr Servs.*, No. 11-CV-2254, 2014 WL 641428, at *8 (S.D.N.Y. Feb. 18, 2014); *Justice v. McGovern*, No. 11-CV-5076, 2013 WL 1809634, at *3 (E.D.N.Y. Apr. 29, 2013); *Tyler v. Liz Claiborne, Inc.*, 814 F. Supp. 2d 323, 344 (S.D.N.Y. 2011).